[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 26, 2001
THOMAS K. KAHN
CLERK

No. 00-10305

D. C. Docket No. 98-08315-CV-FAM

MACK DAVIS,

Plaintiff-Appellant,

versus

TOWN OF LAKE PARK, FLORIDA,
a Florida municipal corporation,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Florida

**(March 26, 2001)**

Before CARNES and MARCUS, Circuit Judges, and HAND[*], District Judge.

MARCUS, Circuit Judge:

---

[*]Honorable W.B. Hand, U.S. District Judge for the Southern District of Alabama, sitting
by designation.

Plaintiff Mack Davis appeals the district court's grant of Defendant Town of Lake Park's motion for judgment as a matter of law on his Title VII race discrimination claim. Davis, an African-American police officer in the Town, alleges that he suffered adverse employment action based on race in the form of two corrective job performance memos placed in his personnel file and two instances where he was temporarily removed as the designated officer-in-charge ("OIC"). The jury returned a verdict for Davis and awarded $1.00 in nominal damages. The district court, however, set aside the verdict and granted the Town's motion for judgment as a matter of law, concluding that no reasonable jury could have found adverse employment action on this record. Because we agree that Davis failed to prove the kind of serious, material change to the terms, conditions, or privileges of his employment required to obtain relief under Title VII's anti-discrimination clause, we affirm.

I.

Davis is the only black police officer in Lake Park, a small community near West Palm Beach, Florida. The department has approximately 20 road patrol officers, plus three sergeants, two lieutenants, and a chief (Jeffrey Lindskoog). The district court's opinion amply sets out the Town's extensive efforts to bring Davis into the police force. Davis was hired in November 1992, and remains a police

officer there. His performance reviews have been excellent or no worse than satisfactory, and his supervisors have recommended him for several awards. He has served many times as one of the department's Field Training Officers ("FTOs"), responsible for teaching new officers the rules and regulations of the department.

In or about January 1996 Davis was selected by his then-shift sergeant, Patricia Gordon, to serve as OIC in her absence. The OIC is the road patrol officer who fills in for the shift sergeant when that sergeant has a day off, takes a vacation, or otherwise is unavailable. The OIC, when acting in that capacity, is to be accorded the same deference and respect as the sergeant. The OIC designation carries no additional pay or benefits, and is only temporary. It usually, although not always, goes to the most senior officer on the shift.

On October 31, 1996, Davis received a memorandum from Lieutenant Jules Barone entitled "Failure to Follow Department Requirements (S.O.P.)." The memo discussed Davis's alleged failure to comply with certain departmental requirements regarding "turning in paperwork on time and keeping your mailbox clean." It continued:

> What makes this situation even more unacceptable is your position as
> a field training officer. How can you possibly expect trainees under
> your direction to follow instructions when you ignore a very basic
> aspect of your job. I expect more from you. As a result, any future

> leave requests will not be granted until all work-related paper work is turned in or you receive a waiver from your supervisor or me.

Davis did not suffer any repercussions from that memo; indeed, a week later, he received a performance evaluation -- prepared by Gordon, and approved by Barone and Chief Lindskoog -- of excellent, and an attendant pay raise.

On December 13, 1996, Gordon elected to designate another officer, Larry Wood, to serve as OIC while she was away on vacation. Gordon testified that she had noticed a "slump" in Davis's performance, and that she felt Davis needed a break from the additional duties imposed by being both OIC and an FTO. Gordon later re-designated Davis to serve as OIC. On January 24, 1997, Davis was again replaced as the designated OIC, this time (according to Davis) based on a decision by Barone that Davis's recent performance was deficient. Gordon concurred in Barone's decision, and designated an officer named Crowell to be OIC instead. Nevertheless, since that time, Davis has served as OIC on various occasions, including at the time of trial.

Meanwhile, on February 5, 1997, Davis received another job performance memo from Barone. The initial version of that memo was quite harsh in its criticism of Davis's recent performance, and identified several specific instances of unacceptable conduct. The memo was placed in Davis's personnel file, prompting Davis to file a union grievance. In response, the department substituted a

4

somewhat softer, revised version of this memo, which stated that Davis's level of performance was "unacceptable for any officer, let alone one who is a field training officer and has served as an OIC." The memo added that it was meant to serve "as a warning that performance of a like nature may result in other department actions." The revised version replaced the initial version in Davis's personnel file, and was put there with the proviso that it would be removed on February 8, 1998, if the performance problems did not reoccur. The union, notably, did not pursue the matter further. Although the personnel file produced during discovery still contained the revised memo, in July 1999 Chief Lindskoog testified at trial -- without contradiction -- that the memo had been removed by that time.

## II.

It is undisputed that Davis did not suffer any reduction in salary, loss of benefits, denial of promotions, workplace reassignment, transfer, or change in permanent job title as a result of these incidents. Nevertheless, on May 14, 1998, Davis filed suit against his employer in the Southern District of Florida, alleging race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1, et seq., the Florida Civil Rights Act, and 42 U.S.C. § 1981. The case was originally assigned to U.S. District Judge Federico Moreno, who denied the Town's motion for summary judgment. In so doing, Judge Moreno rejected the

argument that Davis did not suffer adverse employment action. The case was subsequently reassigned to U.S. District Judge Donald Middlebrooks.

A jury trial was held on July 26-28, 1999. At trial the Town moved for judgment as a matter of law at the close of Davis's case as well as after the close of the evidence. On both occasions the district court reserved ruling. On July 28, the jury returned a verdict in favor of Davis, but awarded him only $1.00 in nominal damages. Before rendering its verdict the jury had submitted to the district judge a note stating: "[W]e appear to be deadlocked. Can you assist? What do we do next?" The district judge responded by ordering the jury to deliberate further.

In a lengthy order dated December 22, 1999, the district court granted the Town's motion for judgment as a matter of law and thereby set aside the jury's verdict. After a detailed discussion of the evolution of the adverse employment action requirement in Title VII cases, the court concluded that the incidents complained of by Davis did not, viewed individually or collectively, amount to adverse action. The district court emphasized that Davis did not suffer any discipline for these incidents, did not lose any pay or benefits, and continued to receive excellent or satisfactory performance reviews with attendant increases in salary. With respect to the February 5, 1997, job performance memo, the court particularly emphasized that the memo was not a formal reprimand, and that

6

according to Chief Lindskoog it had already been removed from Davis's personnel file. In any event, the court wrote, "[m]emoranda of reprimand or counseling that amount to no more than a mere scolding, without any following disciplinary action, do not rise to the level of adverse employment actions sufficient to satisfy the requirements of Title VII." With respect to the brief removals from the OIC designation, the district court wrote that "courts have uniformly held that changes in assignments or work-related duties do not amount to actionable adverse employment action if unaccompanied by a decrease in salary." Finally, as an additional ground for entering judgment in the Town's favor, the court concluded that Davis had failed to prove that he was treated differently than any similarly-situated white employees, and thus failed on that ground as well to establish a prima facie case under Title VII. This appeal followed.[1]

III.

---

[1]Davis argues that the law of the case doctrine required Judge Middlebrooks to adhere to Judge Moreno's earlier ruling at the summary judgment stage that the issues of adverse employment action and prima facie case were questions of fact for the jury. Davis's argument is plainly incorrect. Law of the case does not apply in this situation because Judge Middlebrooks based his post-trial order on a different record than did Judge Moreno when addressing summary judgment. See United States v. Williams, 728 F.2d 1402, 1406 (11th Cir. 1984) (law of the case doctrine "is flexible, and a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court"); United States v. Horton, 622 F.2d 144, 148 (5th Cir. 1980) (holding that the trial court properly reconsidered motion for summary judgment because the production of reports, admissions, affidavits, and other record material during the course of proceedings had clarified and resolved questions of material fact on several issues).

The standard of review is well-settled.  As set forth in <u>Tidwell v. Carter Products</u>, 135 F.3d 1422 (11th Cir. 1998):

> A district court's denial of a defendant's motion for judgment as a matter of law is reviewed de novo, entailing the application of the same standards used by the district court.  <u>Dade County v. Alvarez</u>, 124 F.3d 1380, 1383 (11th Cir. 1997).  Those standards require the consideration of "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986).  All evidence and inferences are considered in a light most favorable to the nonmoving party.  <u>Carter v. City of Miami</u>, 870 F.2d 578, 581 (11th Cir. 1989).
>
>> If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted.  Conversely, if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion was due to be denied and the case was properly submitted to the jury.
>
> <u>Id.</u> (footnotes omitted).  The nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; "there must be a substantial conflict in evidence to support a jury question."  <u>Id.</u>  Accordingly, we must determine whether reasonable jurors could have concluded as this jury did based on the presented evidence.  <u>Quick v. Peoples Bank</u>, 993 F.2d 793, 797 (11th Cir. 1993).

<u>Id.</u> at 1425.  We review the district court's entry of judgment as a matter of law against these familiar standards.

IV.

8

The primary issue in this appeal is whether the district court erred by finding that the alleged adverse employment actions, viewed individually or collectively, were insufficient as a matter of law to support relief under Title VII's anti-discrimination clause. Davis argues that, viewing the evidence in the light most favorable to him, a reasonable jury could have found that the incidents he suffered (the two memos regarding his inadequate performance and the two removals from the OIC designation) constituted adverse employment action sufficient to support relief under Title VII. He contends that the memos are tantamount to reprimands, which he asserts are always deemed actionable under Title VII. Moreover, he contends, the presence of the revised memo in his personnel file jeopardizes his career prospects as a police officer. With respect to the OIC designation, Davis contends that the two occasions on which he was removed constituted "demotions," and in any event are actionable because they deprived him of supervisory experience that could have yielded future benefits. The Town disputes all of these propositions, and repeatedly emphasizes that at no point did Davis suffer any formal discipline or economic injury.

The relevant provision of Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a). Courts have uniformly read this language to require a

9

plaintiff suing under § 2000e-2(a) to establish, as part of his prima facie case, that he suffered so-called "adverse employment action." See Merriweather v. Alabama Dept. of Pub. Safety, 17 F. Supp. 2d 1260, 1274 (M.D. Ala. 1998) (a "term or condition of employment may be said to have been affected if there is a 'demonstrable adverse impact . . .'"), aff'd, 199 F.3d 443 (11th Cir. 1999); see also Allen v. Michigan Dep't of Corr., 165 F.3d 405, 410 (6th Cir. 1999) ("In order to set forth a claim of racial discrimination, a plaintiff must show that he has suffered an adverse employment action[.]"); Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (finding that plaintiff failed to prove "the adverse conduct required to make a prima facie case"). The adverse action requirement is not unique to Title VII's anti-discrimination clause. It has been imposed in cases under Title VII's retaliation clause, even though that provision is not limited to unlawful conduct with respect to the "terms, conditions, or privileges of employment." See Bass v. Board of County Comm'ns, No. 99-10579, slip op. at 1477-78 (11th Cir. Feb. 21, 2001); Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000), cert. denied, 121 S. Ct. 772 (2001); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998); Wu v. Thomas, 996 F.2d 271, 273-74 (11th Cir. 1993). Adverse action is also a requirement in other employment discrimination cases. See Doe v. Dekalb County Sch. Dist., 145 F.3d

10

1441, 1452 (11th Cir. 1998) (noting in ADA case the "requirement that a plaintiff [] show, as part of his prima facie case, that he has suffered an adverse employment action"); McCabe v. Sharrett, 12 F.3d 1558, 1563 (11th Cir. 1994) ("For a public employee to establish that an employment action has infringed a constitutional right the employee must also demonstrate that he or she has suffered some sort of adverse employment action . . . .").

We have never adopted a bright-line test for what kind of effect on the plaintiff's "terms, conditions, or privileges" of employment the alleged discrimination must have for it to be actionable; nor would such a rigid test be proper. See, e.g., Gupta, 212 F.3d at 586 ("Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis."). It is clear, however, that not all conduct by an employer negatively affecting an employee constitutes adverse employment action. See Wideman, 141 F.3d at 1456 ("we do not doubt that there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable"); Wu, 996 F.2d at 273-74 (although we "have never defined what this general phrase [adverse employment action] means," none of our prior decisions "establish the proposition that every unkind act, even those without economic consequences, can violate Title VII"); Merriweather, 17 F. Supp. 2d at 1274 (a

11

"term or condition of employment may be said to have been affected if there is a 'demonstrable adverse impact . . .'"). This limitation is consistent with the basic principle that "Title VII[ ] is neither a general civility code nor a statute making actionable the 'ordinary tribulations of the workplace.'" Gupta, 212 F.3d at 587 (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999)).

Courts have used different words to define the "threshold level of substantiality" required by Title VII. Wideman, 141 F.3d at 1456. In Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998), for example, a case primarily discussing a supervisor's vicarious liability for sexual harassment under Title VII, the Supreme Court suggested that some kind of significantly adverse employment action is necessary to prove an employer's Title VII liability:

> Every Federal Court of Appeals to have considered the question has found vicarious liability when a discriminatory act results in a tangible employment action. . . . The concept of a tangible employment action appears in numerous cases in the Courts of Appeals discussing claims involving race, age, and national origin discrimination, as well as sex discrimination. Without endorsing the specific results of those decisions, we think it prudent to import the concept of a tangible employment action for resolution of the vicarious liability issue we consider here. A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

524 U.S. at 760-61, 118 S. Ct. at 2268 (emphasis added) (citation omitted). Other courts, rather than using the word "significant," have used the word "material."

12

See, e.g., Allen, 165 F.3d at 410 (adverse employment action requirement means that the employee "must establish that he has suffered a 'materially adverse' change in the terms or conditions of employment because of the employer's actions"); Harlston, 37 F.3d at 382 ("[c]hanges in duties or working conditions that cause no materially significant disadvantage" are not actionable); see also Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993) (requiring under parallel provisions of ADEA a "materially adverse change" in employment status). Still other courts have spoken of requiring the plaintiff to prove "'serious and tangible'" effects from the employer's action. See Bass, slip op. at 1478 (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997) (discussing Title VII's retaliation clause)).

As applied, these standards are essentially interchangeable: Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must

13

show a <u>serious and material</u> change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. <u>See</u> <u>Doe</u>, 145 F.3d at 1453 (test for adverse employment action in ADA case patterned after Title VII is whether "a reasonable person in [the employee's] position would have found [the alleged alteration of the terms and conditions of employment] to be adverse under all the facts and circumstances").[2]

Davis's claim is predicated on two kinds of employer acts that frequently are alleged as adverse employment action even though they do not often meet the statutory threshold. First, Davis relies upon the negative job performance memoranda placed in his file. Neither of the memos at issue caused him any present or foreseeable future economic injury; he maintains, however, that these memoranda were unwarranted, diminished his prestige and self-esteem, and potentially may interfere with (unspecified and unexplored) future job prospects. Second, Davis relies upon the changes in his work assignments -- specifically, his

---

[2]Davis cites several times to broad language from a former Fifth Circuit decision, <u>Rogers</u> <u>v. EEOC</u>, 454 F.2d 234, 238 (5th Cir. 1971). <u>Rogers</u> was not addressing the standard for adverse employment action, considering instead an allegation of hostile work environment. The court certainly did not hold, as Davis contends, that "loss of intangible benefits of employment, like prestige, responsibility, and opportunity for growth, are [always] actionable in claims of discrimination."

two "demotions" from the OIC designation. Again, neither incident caused any economic injury; regardless, says Davis, it is enough that they diminished his prestige and deprived him of experience which might make him more likely to obtain (as yet unsought) promotions in the future. As we discuss, Congress simply did not intend for Title VII to be implicated where so comparatively little is at stake.

## A.

We do not view either of the job performance memoranda as constituting adverse employment action. The October 31, 1996, memo, as noted above, was not a formal reprimand under the terms of the Town's "progressive discipline" structure, but rather was a "counseling memorandum" expressing concern and criticism by Barone over one aspect of Davis's recent performance. Although the memo described the improper conduct (failing to turn in certain documents) as "unacceptable" and accused Davis of "ignor[ing] a very basic aspect of your job," the memo concluded simply by saying that "any future leave requests will not be granted until all work-related paper work is turned in or you receive a waiver from your supervisor or me." It is undisputed that Davis did not suffer any tangible consequence from this memo, in the form of a loss of pay or benefits or further discipline. Indeed, shortly after this memo, Davis received his annual evaluation

15

with an overall rating of "excellent" and thereby received a contractually-mandated salary increase, further suggesting that the memo did not have a material impact on the terms and conditions of his employment. Viewed in isolation, the October 31 memo is not actionable under Title VII.

The later job performance memo (issued February 5, 1997, and revised thereafter) is likewise not actionable. Although this memo was sterner than its predecessor, it is still not alleged to be a reprimand under the Town's discipline scheme, and again, Davis did not suffer any loss of pay or benefits, or even a negative annual performance evaluation, as a result of it. The revised memo described several episodes that Barone considered "unacceptable" and warned that "performance of a like nature may result in other departmental actions," but categorized these events as only a "cause[] for concern" that could be resolved with improved performance in the future.

Davis's primary objection is that this revised memo was retained in his personnel file, and thus could jeopardize his chances of obtaining a different position in the future within the Town or elsewhere. As Davis sees it, a police officer's personnel file is especially important as a record of the officer's performance and a resource upon which potential future employers will judge him. His view was substantiated by the trial testimony of several witnesses.

16

There are several difficulties with this argument. First, courts are wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline. In Merriweather, for example, we affirmed the district court's finding that a written counseling statement that did not constitute a reprimand was not actionable in a Title VII retaliation claim. The district court's analysis of the issue is pertinent here:

> Merriweather complains that she received a written counseling statement on November 6, 1996 for conduct she did not commit in retaliation for [protected conduct]. Defendants contest whether such counseling rose to the level of adverse employment action and whether Merriweather can establish a causal connection between her exercise of protected speech and the counseling. . . .

> In the present case, Defendants appear to contend that the written counseling did not amount to even a non-threatening written reprimand. Defendants contend that a warning or counseling is the lowest grade of discipline in the State system, does not subtract points from an employee's evaluation, does not affect an employee's salary, and is not punitive. Merriweather has not alleged that this written counseling has had any adverse impact on her employment. She has not produced any evidence to support that she has been fired, demoted or denied any pay increase because of the counseling. Nor have any of the terms of her employment been adversely affected because of the counseling. This court therefore finds that the written counseling does not constitute adverse employment action, and that Merriweather has failed to state a prima facie case of retaliation based upon the written counseling.

17

17 F. Supp. 2d at 1275 (emphasis added).

Other courts have taken a similar approach, finding that criticisms of an employee's job performance -- written or oral -- that do not lead to tangible job consequences will rarely form a permissible predicate for a Title VII suit. See, e.g., Allen, 165 F.3d at 409-10 (counseling memoranda, unlike denial of promotion, did not constitute "materially adverse" employment action even though motivated by racial animus); Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998) (counseling memoranda and "negative performance evaluations, standing alone, cannot constitute an adverse employment action"); Rabinowitz v. Pena, 89 F.3d 482, 488 (7th Cir. 1996) (rejecting proposition that "a low performance rating is always an adverse employment action"); Meredith v. Beech Aircraft Corp., 18 F.3d 890, 896 (10th Cir. 1994) (allegedly unjustified negative performance evaluation held not actionable); Milburn v. West, 854 F. Supp. 1, 14 (D.D.C. 1994) (memorandum "for the record" that recounted employee misconduct and requested more formal discipline against employee deemed not actionable even though it was placed in employee's permanent file), summ. aff'd sub nom., Walker v. West, No. 94-5228 (D.C. Cir. Feb. 7, 1995) (per curiam); Nelson v. University of Maine Sys., 923 F. Supp. 275, 282-83 (D. Me. 1996) ("mere criticism, or counseling, of an employee" is not actionable); Coney v. Department of Human Res., 787 F. Supp.

18

1434, 1442 (M.D. Ga. 1992) (non-threatening written reprimand, later removed from employee's personnel file, held not actionable); Medwid v. Baker, 752 F. Supp. 125, 137 (S.D.N.Y. 1990) (counseling of employee for performance deficiency not materially adverse action).[3]

Given that Congress in § 2000e-2(a) has expressly limited the types of employer actions which may give rise to a Title VII discrimination claim, such a claim rarely may be predicated merely on employer's allegedly unfounded criticism of an employee's job performance, where that criticism has no tangible impact on the terms, conditions, or privileges of employment. An employee who receives criticism or a negative evaluation may lose self-esteem and conceivably may suffer a loss of prestige in the eyes of others who come to be aware of the evaluation. But the protections of Title VII simply do not extend to "'everything that makes an employee unhappy.'" Robinson, 120 F.3d at 1300 (holding that oral

---

[3]Likewise, in Graham v. State Farm Mutual Insurance Co., 193 F.3d 1274, 1283 (11th Cir. 1999) (per curiam), we found that a counseling memo expressing concern with plaintiff's improper absences and warning of possible ramifications "simply did not meet the 'threshold level of substantiality' required by the Eleventh Circuit in Wideman." In so doing, we stressed that the "plaintiff did not suffer any repercussions" from the memo, and that "[i]n such circumstances, courts have generally found no adverse employment action." Id. Although we remarked in dicta that "undeserved negative job evaluations" may be actionable under Title VII's retaliation clause, Graham did not address Title VII's anti-discrimination clause. Moreover, Wideman, the sole opinion cited for that proposition, did not hold that negative job evaluations are actionable; indeed, it emphasized that "there is some level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause." 141 F.3d at 1456.

19

reprimands were not actionable under Title VII's retaliation clause and adding that "[o]therwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'") (quoting Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996)).

Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance. Federal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee. Simply put, the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely -- without more -- establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause.[4]

_____

[4]Davis cites dicta in Doe, an ADA case, to assert that a loss of prestige is by itself sufficient to state a claim. Doe does not hold that an asserted loss of prestige can transform employer conduct which does not alter the "terms, conditions, or privileges" of the plaintiff's employment into a proper basis for suit under Title VII's anti-discrimination clause. Indeed,

Second, to the extent Davis's concern is that the revised memo became part of his personnel file, the undisputed evidence at trial established that the memo has now been removed. The memo may not have been removed by the promised date (February 5, 1998), but Chief Lindskoog testified without contradiction at trial in July 1998 that it had been removed by that point. We are not aware of any record evidence establishing that the inclusion of the memo in Davis's personnel file between February 1997 and no later than July 1999 affected his job prospects within or beyond the Town in any way.[5] There is no testimony, for example, suggesting that Davis was denied a promotion in the Town or passed over for a job elsewhere due to the presence of that memo in his file. Nor is there any evidence that the contents of the memo (or the October 31 memo, for that matter) were disclosed to other officers. Accordingly, Davis cannot show any tangible consequences from the memo.

_____

discussing the job transfer at issue in that case, we stressed that "it is not enough that a transfer imposes some de minimis inconvenience or alteration of responsibilities." Id. at 1453.

[5]Davis contends, without dispute, that by law this document cannot be destroyed, and remains theoretically accessible to potential future employers and members of the public under Florida's public records laws. The significance of that information is unclear, however. If indeed the document has been eliminated from Davis's personnel records, we cannot conceive (and have not been told by the parties) how that document might nevertheless someday be circulated to potential future employers. In any event, the important point here is that Davis has made no showing on this record that the memos at issue had any effect, let alone tangible effect, on him beyond assertedly diminishing his prestige and self-esteem. Moreover, the fact that the allegedly unjustified evaluations are written as opposed to oral, and hence recorded in more permanent fashion, does not change this fundamental defect in Davis's argument.

In any event, this kind of allegation -- that the employer's criticism or negative evalution may affect the employee's prospects -- does little to advance Davis's claim even if true. Any job criticism or negative job review carries with it the possibility that the employee's future prospects may be prejudiced if that information is disclosed. A negative evaluation that otherwise would not be actionable will rarely, if ever, become actionable merely because the employee comes forward with evidence that his future prospects have been or will be hindered as a result.

B.

The other adverse actions alleged by Davis concern the two instances when he was briefly "removed" as the designated Officer-in-Charge. Davis attempts to cast these incidents as tantamount to a demotion, which clearly may be actionable under Title VII, by characterizing his appointments as OIC as a promotion. Alternatively, Davis alleges that these incidents altered his work assignments, a step which some courts have said may constitute adverse employment action if the change in job responsibilities is substantial.

Viewing the OIC designation as a promotion, so that even a brief removal from that designation constitutes a demotion actionable under Title VII, is not

22

persuasive.[6] The OIC designation is, by definition, ephemeral: an officer is not permanently named the OIC for any given shift, but rather that determination is made on a case-by-case basis by the relevant supervisory officials. Davis contends that all at-will employment positions may be viewed as temporary in the sense that the employee may be removed from the position at any time, and that accordingly emphasizing the temporary nature of the OIC designation is misleading. But the OIC designation, unlike an ordinary at-will job, exists solely as a stop-gap measure to ensure that certain duties are fulfilled in the event the officer normally responsible for those duties becomes unavailable. Moreover, being designated OIC does not bring with it any increase in salary or benefits, or unique opportunities for advancement within the department. Finally, if we accept that the OIC designation is usually given as a matter of course to the most senior road patrol officer on a given shift, then it is even more difficult to view that designation as the same kind of recognition of achievement that a promotion typically implies.

Equally unpersuasive is Davis's argument that the two occasions when he was removed as OIC constituted a material change in his regular work

[6]The OIC designation is not deemed a promotion under the Town's code or personnel policies. Davis makes much of the fact that in its summary judgment papers to the district court the Town's attorneys referred to the process by which a road patrol officer is "promoted" to OIC. The Town has since retreated from that presumably inadvertent description, and we do not attach great importance to it, especially as it was made in the context of the Town arguing that the removals from the OIC designation cannot be deemed adverse employment actions.

23

assignments. As noted above, OIC is an ephemeral designation; it was not presented to Davis as becoming, and did not become, a permanent feature of his job responsibilities as an employee of the Town. Nor is it clear that actual additional responsibilities of serving as OIC were substantial, at least during the periods that Davis served in that capacity; after all, a person assumed OIC duties only on a part-time basis when the sergeant or other more senior shift supervisor was absent, and even then it is not established on this record that a great deal of additional work or responsibility was involved. Cf. Allen, 165 F.3d at 409-10 (no claim of adverse employment action based on defendant's failure to permit corrections officer to serve as "acting sergeant" in regular sergeant's absence).

Furthermore, even assuming that there is some prestige attached to being designated as OIC, any loss of prestige suffered by Davis on these two occasions must be weighed against the fact that he served as OIC on subsequent occasions after each instance when he was removed. Cf. Yates v. Avco Corp., 819 F.2d 630, 638 (6th Cir. 1987) (temporary demotion of employee to lower grade level, with no change in salary or benefits and the assurance that she would be restored to her prior, higher grade level once a new position became available, held not actionable under Title VII). More to the point, even accepting that Davis may have felt some

blow to his professional image when he was removed as OIC, that is simply not enough to prevail on this record.

A contrary view would potentially open the door to a wide variety of unfair work assignment claims that should not be litigated in the federal courts. Title VII is not designed to make federal courts "'sit as a super-personnel department that reexamines an entity's business decisions.'" Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991); see also Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997) (stressing that "federal courts do not sit to second-guess the business judgment of employers"). Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities. The same concern exists for public entities such as the Town's Police Department, which must balance limited personnel resources with the wide variety of critically important and challenging tasks expected of them by the public.

For these reasons, applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks. Courts elsewhere have been reluctant to hold that changes in job duties amount to adverse employment action

when unaccompanied by any tangible harm.  See, e.g., Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1557 (D.C. Cir. 1997) (agreeing with "other circuits [which] have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes.") (citing, inter alia, Kocsis v. Multi-Care Mgmt., 97 F.3d 876, 886-87 (6th Cir. 1996) and Crady, 993 F.2d at 136).

We do not suggest that a change in work assignments can never by itself give rise to a Title VII claim; in unusual instances the change may be so substantial and material that it does indeed alter the "terms, conditions, or privileges" of employment.  Cf. McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1077-78 (11th Cir. 1996) (holding that district court erred by refusing to submit verdict form allowing ADA plaintiff to recover for conduct short of termination where plaintiff alleged that he had been relieved of his supervisory duties, assigned to clean toilets as a janitor, and later reassigned to shipping department where he was expected to perform physical tasks difficult or impossible for him to complete).  In the vast majority of instances, however, we think an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause -- especially where, as here, the work assignment at issue is

26

only by definition temporary and does not affect the employee's permanent job title or classification.

To the extent Davis's removal as OIC on these two occasions deprived him of valuable experience that might have given rise to more lucrative opportunities within the department or elsewhere, Davis acquired that experience by serving as OIC on previous and subsequent occasions. In any event, this claim of harm is made only at the highest order of abstraction; there is no evidence that Davis sought, let alone was denied any opportunity due to his removal as OIC on the two occasions at issue. The OIC incidents plainly do not establish adverse employment action.

## C.

Davis also contends that even if none of the particular incidents about which he complains (the two memos and the two instances when he was removed as OIC) amounts to adverse employment action when viewed in isolation, viewed as a whole these incidents do support a Title VII discrimination claim. We disagree.

Davis's argument relies almost entirely upon our opinion in Wideman, which discussed adverse employment action in the context of a Title VII retaliation claim. There, we stated that it was "enough to conclude, as we do, that the actions about which Wideman complains considered collectively are sufficient to

27

constitute prohibited discrimination. We need not and do not decide whether anything less than the totality of the alleged reprisals would be sufficient." 141 F.3d at 1456.

The facts of Wideman are altogether different than those present here. In Wideman, the employee not only received two formal written reprimands, she also was suspended, threatened, and her health was put in jeopardy. Id. at 1455. Although Wideman did not purport to answer the question, at least one of these sanctions (the suspension) presumably would be actionable standing alone under our precedent. In this case, by contrast, Davis was not suspended, was not given a formal reprimand, and suffered little if any of the verbal harassment apparently suffered by the plaintiff in Wideman. Viewed individually or collectively, the adverse action alleged by Davis is highly insubstantial in comparison to the misconduct alleged in Wideman.

In the end, no reasonable jury could view the relatively minor incidents suffered by Davis as the kind of adverse employment action that Title VII was intended to redress. The fact that the jury awarded Davis only nominal damages is a telling indication that the Town's alleged misconduct did not impact Davis in any material way. We do not diminish the seriousness of Davis's allegations of race-motivated conduct (allegations which the jury apparently credited in a verdict that

28

the Town, notably, does not contest on that basis). But while Congress certainly could have extended the protection of Title VII to all aspects of the employment relationship, it plainly did not so, and instead contemplated relief under the statute's anti-discrimination clause only to employees injured in the "terms, conditions, or privileges" of their employment. The injuries alleged by Davis -- loss of prestige and potential future opportunities associated with two negative job performance memoranda and the denial on two brief occasions of a favorable work assignment -- do not meet the threshold set by Congress.

Because adverse employment action is an indispensable element of a Title VII plaintiff's case, Davis's failure to present sufficient evidence for a reasonable jury to find that this element was met is fatal to his case. See Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998) ("Although a plaintiff's burden in proving a prima facie case is light, summary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a prima facie case.") (citations omitted).[7] Accordingly, the district court properly entered judgment against Davis and in favor of the Town.

**AFFIRMED.**

---

[7]Because we find that Davis failed to prove adverse employment action, his Title VII claim fails on that basis alone, and we do not reach the Town's alternative argument that Davis was required to show, but did not show, that similarly-situated white employees were treated differently than he was.