Joseph J. GRANT, Plaintiff–Appellant,

v.

MIAMI–DADE COUNTY WATER
& SEWER DEPARTMENT,
Defendant–Appellee.

No. 15–10168
Non–Argument Calendar.

United States Court of Appeals,
Eleventh Circuit.

Nov. 23, 2015.

Mayra Lizette Kadzinski, Kadzinski Law Firm, Boca Raton, FL, for Plaintiff–Appellant.

Marlon Delano Moffett, Miami, FL, for Defendant–Appellee.

Before TJOFLAT, WILSON, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Joseph Grant, an African–American male, appeals from the district court's grant of summary judgment in favor of Miami–Dade County Water & Sewer Department (the "County") in his employment-discrimination and retaliation suit under Title VII, 42 U.S.C. §§ 2000e–2, 2000e–3, and the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10.[1] Grant claims that he was denied training opportunities and a promotion because of his race and that he was retaliated against for complaining to human resources and the Equal Employment Opportunity Commission ("EEOC") about the alleged discrimination. The district court granted summary judgment to the County on all claims. After careful review, we affirm.

**I.**

Grant began working for the County as a Treatment Plant Operator 1 ("TPO–1") in one of its three regional wastewater facilities in 2006.[2] Eventually, Grant requested transfer to the South District

---

1. We analyze Grant's claims under the FCRA under the same legal framework as his Title VII claims because the FCRA was patterned after Title VII. *See Wilbur v. Corr. Servs. Corp.,* 393 F.3d 1192, 1195 n. 1 (11th Cir.2004) ("The Florida Civil Rights Act was patterned after Title VII, and Florida courts have construed the act in accordance with decisions of federal courts interpreting Title VII.").

2. We recite the facts drawing all reasonable inferences in favor of Grant, the non-moving party. *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1363 (11th Cir.2007).

plant ("Blackpoint") because it was undergoing an expansion and offered more opportunity for advancement. Blackpoint is a massive facility covering 365 acres with complex and diverse equipment and processes for wastewater treatment. Grant was warned by other employees that Blackpoint was "a racist plant."

Steve Kronheim, who is white, was the Chief Plant Operator at Blackpoint. Before transferring to Blackpoint in May 2010, Grant had several meetings with Kronheim. Grant told Kronheim that he was interested in being promoted to a higher-level TPO–2 position at Blackpoint. Although Kronheim encouraged Grant to transfer because additional TPO–2s were needed with the plant expansion, Kronheim explained that Grant would need to learn the processes first and then he would have the possibility of promotion.

After his transfer, Grant frequently asked Kronheim for training opportunities to gain knowledge and training in aspects of the plant. For example, Grant asked to perform "lead operator" duties or to take on "acting supervisor" responsibilities. According to Grant, Kronheim repeatedly denied his requests, while he permitted other operators to perform such tasks.

At some point, Grant applied for one of nine open TPO–2 positions at Blackpoint.[3] There is no dispute that Grant was qualified for the position. Grant's interview was held on March 16, 2011. Unlike other applicants, who were given up to two months' advance notice, Grant was notified of the interview less than twenty-four hours beforehand. The interview panel consisted of two white males, including Kronheim, an African–American male, and a Hispanic female. Grant was not hired because he did not achieve the minimum

score of 63. All four panelists scored him below 63. The County filled only five of the nine positions.

In April 2011, Grant complained to human resources about what he felt was a discriminatory hiring process, and he also filed a charge of discrimination with the EEOC. Following these complaints, Kronheim summoned Grant into his office and angrily told Grant to do "damage control" and apologize to the people who he had accused of discrimination, including Kronheim. Grant did not do so.

In September 2011, the County requested Grant's criminal and credit records from a public-records company.

In February 2012, Grant sought additional employment outside of the County. He applied for a TPO–2 position with the City of Fort Lauderdale. Grant filed with the County a request for outside employment, which Kronheim approved. But a Department Director denied the request on grounds of safety and a "conflict of interest" because Grant's position was considered "essential." Nonetheless, Grant began working for Fort Lauderdale on April 2, 2012. Because Grant worked the night shift at Blackpoint, the schedules did not overlap. Ultimately, Grant resigned his position with the County. His last day of work was in July 2012.

## II.

Grant filed his complaint in the United States District Court for the Southern District of Florida. In an amended complaint, Grant pled the following three claims: (1) while working for the County, he was subjected to disparate treatment on account of his race because he was denied additional

---

3. The record is not entirely clear on when Grant applied for the position, whether it was in January 2010 or January 2011. In any

case, the parties do not suggest that the timing is critical.

training opportunities, while other employees outside his race were not (Count 1); (2) he was denied a promotion on account of his race (Count 2); and (3) the County retaliated against him for filing a charge of discrimination with the EEOC by denying his request for outside employment (Count 3).[4]

After discovery, the County filed a motion for summary judgment, which the district court granted. In broad terms, the district court concluded that Grant did not establish *prima facie* cases on Counts 1 and 3 because he had not shown that he was subjected to an adverse employment action, nor had he shown that the County's reasons for its actions were a pretext for discrimination. Also, with regard to Count 3, the court determined that Grant did not demonstrate a causal connection between the alleged retaliation and the filing of his EEOC charge, which occurred nine months apart. As for Count 2, the failure-to-promote claim, the court concluded that Grant failed to show the interview process was evidence of pretext. Grant now appeals.

### III.

We review a district court's grant of summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in favor of the non-moving party. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir.2007). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

### III.

Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1). Claims of discrimination may be supported by either direct or circumstantial evidence. When a claim is based on circumstantial evidence, we generally apply the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir.2005).

Under the *McDonnell Douglas* framework, the plaintiff must first create an inference of discrimination by making out a *prima facie* case. *Id.* The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. *Id.* If the employer does so, "the inference of discrimination drops out of the case entirely," and the plaintiff then has the opportunity to show that the employer's proffered reasons were a pretext for discrimination. *Id.* at 768. The plaintiff's burden at the pretext stage "merges with the plaintiff's ultimate burden of persuading the court that the employer intentionally discriminated against [him]." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir.2010).

A plaintiff may establish a *prima facie* case of disparate treatment by showing that he (1) is a member of a protected class; (2) was subjected to an adverse employment action; (3) was treated less favorably than another similarly situated employee outside the protected class; and (4) was qualified. *E.E.O.C. v. Joe's Stone*

---

4. Count 4 of the complaint alleged the same violations under the FCRA, which, as mentioned in footnote 1, we address jointly with the Title VII claims. Grant also alleged a failure-to-promote claim based on events in March 2010, but the district court dismissed this claim because Grant did not exhaust his administrative remedies. Grant does not challenge this ruling on appeal, so we do not address it further.

*Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000). There is no dispute that Grant was qualified and is a member of a protected class.

To establish an "adverse employment action," the plaintiff "must show a *serious and material* change in the terms, conditions, or privileges of employment.". *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir.2001). The plaintiff's subjective beliefs about the action do not control; the challenged employment action must be "materially adverse as viewed by a reasonable person in the circumstances." *Id.; see also Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1215 (11th Cir.2008).

As for the third element, we have stated that "[t]he plaintiff and the employee [he] identifies as a comparator must be similarly situated in all relevant respects. The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir.2004) (citations and internal quotation marks omitted).

To show pretext, a plaintiff generally must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez*, 610 F.3d at 1265 (citation and internal quotation marks omitted). The inquiry into pretext centers on the employer's beliefs, and a plaintiff cannot establish pretext simply by quarreling with the wisdom of an employer's business decisions. *Id.* at 1265–66.

**A.**

■ The district court did not err in concluding that Grant failed to establish a *prima facie* case of disparate treatment with regard to the denial of training opportunities. Even assuming without deciding that Grant showed that he had experienced an adverse employment action,[5] Grant failed to present evidence suggesting that Grant was denied training that was provided to other similarly situated employees outside of his protected class. *See Wilson*, 376 F.3d at 1091. Grant's comparators, Aldo Arteaga and Ruben Gutierrez, were not similarly situated. Arteaga denied ever serving in an acting capacity as a TPO–1. Rather, Arteaga was a TPO–2 when he served as an "acting supervisor." Similarly, Gutierrez started at Blackpoint as a TPO–2 and denied ever serving in any acting capacity. Thus, they were not similarly situated, and summary judgment was appropriate because there

---

5. In order to be actionable under Title VII, Grant needed to show that he suffered a tangible ("real and demonstrable"), materially adverse harm due to the allegedly discriminatory denial of training opportunities. *See Davis*, 245 F.3d at 1239–40. Grant identifies as his only tangible harm his belief that the denial of training opportunities cost him points in the interview for the TPO–2 position and therefore led to the denial of a promotion. But little evidence exists connecting the alleged denial of training opportunities to Grant's insufficient interview score. *See id.* at 1239 ("[T]he asserted impact cannot be speculative and must at least have a tangible ad-

verse effect on the plaintiff's employment."). Grant identifies one specific interview question about an applicant's length of experience as a "lead operator," one of the training opportunities denied, but that question counted for only 5 points out of a total of 105. Grant's interview score of 56 was 7 points below the number required to qualify for a position, so even if Grant had received the full 5 points on the question based on experience, he still would not have qualified. Aside from the questions about length of prior experience, Grant admitted that he could have sufficiently prepared for the interview by studying materials he had studied in the past.

was no other direct evidence of discrimination. *Wilson*, 376 F.3d at 1092.

█ In any case, aside from his *prima facie* case, Grant did not establish that the articulated reasons for the County's actions were pretextual. *See Alvarez*, 610 F.3d at 1265. None of the evidence proffered demonstrates that Kronheim did not honestly in good faith believe that Grant needed to learn the TPO-1 position better before being assigned any TPO-2 duties or that the real reason for denying Grant additional training opportunities was racially motivated. Grant argues in essence that he did his job well, that he was fully qualified, and that there was no reason to deny him the opportunity to serve as a lead operator or acting TPO-2, which he contends is supported by the depositions of various former coworkers and his annual evaluations. But the relevant inquiry takes into account the employer's beliefs, not the employee's, and a plaintiff cannot simply substitute his own business judgment for that of the employer. *See id.* at 1265–66. The division of work assignments and responsibilities sits "at the very heart of an employer's business judgment and expertise." *Davis*, 245 F.3d at 1244. Accordingly, summary judgment was appropriate on Grant's claim of disparate treatment based on the denial of on-the-job training opportunities.

### B.

█ With regard to Grant's failure-to-promote claim, there is no dispute that Grant established a *prima facie* case. Nor does Grant dispute that he failed to achieve a passing interview score or that this was the reason he was not promoted. Rather, Grant argues that the underlying interview process is evidence of pretext because it was materially different from the County's policy and practice and contained questions that were specifically designed to exclude him. Grant specifically points to the following: (1) inadequate advance notice of the interview; (2) the composition of the interview panel; and (3) the questions asked.

Grant has not shown that the alleged irregularities in the interview process are sufficient evidence of pretext to preclude summary judgment. With regard to notice, although Grant received less notice than other applicants, the record contains no explanation for why he did, and we will not simply speculate that it was done for a discriminatory purpose. In addition, Grant admitted that he knew he was going to be interviewed when he submitted his application and that he could have prepared for the eventual interview.

Regarding the interview itself, and assuming, as Grant contends, that the interview process was newly formulated and controlled by Kronheim, there is no evidence that either the composition of the panel or the questions themselves were pre-selected for an improper discriminatory purpose, or that the procedures utilized violated any policy. And it is undisputed that the same four panelists interviewed all applicants for the TPO-2 positions at Blackpoint and that the panelists asked the same questions to every applicant.

The composition of the panel did not violate County guidelines, which recommend a panel of "at least" three panelists of diverse backgrounds, not only three, despite general prior practice. The recruitment supervisor for human resources testified that four people were on the panel because "the division had requested that they wanted to have all three of their chief plant operators sit on the panel" due to the "essential and critical nature" of the position. Because two of the chief plant operators were white males and one was an African–American male, an Hispanic female was added to balance the panel.

Grant has not shown that the County's explanation in this respect is unworthy of credence.

With respect to the questions, we will not second-guess the County's business decision about what questions to ask in a job interview or what points to award based on the answers thereto, particularly when the questions undisputedly relate to technical knowledge relevant to the job and prior relevant experience. As for the nepotism question Grant points to, it was not scored and it played no part in Grant's not being offered the TPO–2 position.

Finally, there is no evidence that the background check performed by the County in September 2011 had anything to do with Grant's application for the TPO–2 position in March 2011. Internal communications revealed that the check was performed as part of a standard, required review process prompted by Grant's renewal of his County identification card in August 2011.

Overall, Grant has not presented sufficient evidence by which a reasonable jury could conclude that the County's reason for denying him a promotion was pretextual or that the decision was motivated by discriminatory animus.[6]

### V.

Finally, Grant argues that he established a *prima facie* case of retaliation and that, in determining whether he had suffered an adverse action, the district court applied the wrong standard for determining what constitutes an adverse action in the retaliation context.

The anti-retaliation provision of Title VII forbids an employer from retaliating against an employee because he has opposed "an unlawful employment practice." 42 U.S.C. § 2000e–3(a). In order to make out a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) a causal connection exists between the protected activity and the materially adverse action. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir.2010).

In *Burlington Northern and Santa Fe Railroad Co. v. White*, the Supreme Court clarified that an adverse employment action under "the antiretaliation provision [of Title VII], unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." 548 U.S. 53, 64, 126 S.Ct. 2405, 2412–13, 165 L.Ed.2d 345 (2006). Instead, the test is whether "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68, 126 S.Ct. at 2415 (internal quotation marks omitted).

To show a causal connection, a plaintiff can rely on proximity of the protected activity and the alleged retaliation.

---

6. To the extent that Grant contends that he has presented a triable issue of fact outside of the *McDonnell Douglas* framework, we disagree. It is true that the burden-shifting framework of *McDonnell Douglas* "is not, and was never intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir.2011). A plaintiff may create a triable issue of fact "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* But, for similar reasons as discussed above, Grant has not shown such a convincing mosaic of circumstantial evidence with respect to either of his discrimination claims.

However, "if there is a substantial delay between the protected [activity] and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004). So, while a one-month period between the protected activity and the adverse action may be sufficient to show causation, a period of three to four months is too attenuated absent other evidence. *Id.*

■ We agree with Grant that the district court appears to have applied the heightened substantive-discrimination standard—whether the action in fact had a materially adverse effect on Grant—to his retaliation claim. This was error. Instead, the court should have asked whether a "reasonable employee would have found the challenged action materially adverse." *Burlington,* 548 U.S. at 68, 126 S.Ct. at 2415.

■ In any case, the error is harmless. Even assuming that the denial of his request for outside employment was sufficiently adverse, Grant failed to establish causation, as more than a nine-month period elapsed between Grant's last EEOC filing and denial of his request. *See Higdon,* 393 F.3d at 1220. Moreover, even if he had established a *prima facie* case, summary judgment would still have been appropriate because he did not present any evidence that the County's reasons for denying his request—safety concerns and a potential conflict of interest—were actually false and that the real motive was discrimination.

Grant also argues that Kronheim's instructions to apologize to the individuals he accused of discrimination and to with-draw his human-resources complaint were *per se* retaliatory. These contentions are not properly before us because they were not pled as the basis for a retaliation claim in the amended complaint and were raised only in response to the County's motion for summary judgment. *See Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir.2004) (holding that plaintiffs cannot raise new claims in response to a summary-judgment motion). Nor did the district court address this claim.

But even if claim were properly before us, Grant did not show that Kronheim's statements following Grant's complaint of discrimination would "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington,* 548 U.S. at 68, 126 S.Ct. at 2415. To be clear, it is absolutely not acceptable for a supervisor to react to a complaint of discrimination by demanding an apology or seeking to have the employee withdraw the complaint. Nonetheless, the anti-retaliation provision does not protect an individual "from all retaliation, but from retaliation that produces an injury or harm," *id.* at 67, 126 S.Ct. at 2414, and we cannot conclude, based on the limited evidence in the record, that Grant showed that a reasonable employee would have been dissuaded from pressing a charge of discrimination if he had known in advance that his supervisor would tell him to withdraw the charge or would seek an apology.[7] In sum, the district court properly granted summary judgment on Grant's retaliation claims.

**VI.**

In conclusion, the district court properly granted summary judgment to the County

---

7. In fact, Grant himself refused to apologize. Grant certainly had no reason to apologize for bringing what he viewed as discrimination to the attention of the Human Resources Department and was right not to do so. But the fact that he did not apologize tends to suggest that Grant would have complained even had he known before doing so that his supervisor would tell him to withdraw the charge or would seek an apology.

on Grant's claims of discrimination and retaliation arising out of his employment with the County at its Blackpoint wastewater treatment facility. Therefore, we affirm.

**AFFIRMED.**