Judy WEHUNT, Plaintiff,

v.

R.W. PAGE CORPORATION, d/b/a Columbus Ledger–Enquirer, and Knight–Ridder, Inc., Defendants.

No. 4:03–CV–30 (CDL).

United States District Court,
M.D. Georgia,
Columbus Division.

Dec. 15, 2004.

under Title VII and 42 U.S.C. § 1981. Accordingly, Defendants' motions for summary judgment are granted as to Plaintiff's federal law claims. Having disposed of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim for the intentional infliction of emotional distress. Therefore, that claim is dismissed without prejudice.

## BACKGROUND

Plaintiff began her employment at the Ledger in May 2000 having previously been employed at the Macon Telegraph as the State Editor. She terminated her employment with the Macon Telegraph when she was asked to resign by the Executive Editor due to a personal relationship she had developed with a subordinate reporter, Wayne Wehunt, whom Plaintiff eventually married in August 2000. Plaintiff was hired by Mike Burbach, the Ledger's Executive Editor, to be the Metro Editor. In that position, Plaintiff was responsible for the paper's coverage of local news.[1] She was to report to Burbach and Susan Catron, the paper's Managing Editor. As Metro Editor, she supervised two Assistant Metro Editors (Jerry Rutledge and Ben Wright) and between four and seven reporters.[2]

Maxine Hardy, Gwyn Newsom Bunn, Columbus, GA, for Plaintiff.

Deborah A. Sudbury, Theresia M. Moser, Jennifer E. Moore, Atlanta, GA, for Defendants.

### ORDER

LAND, District Judge.

Plaintiff, a white female, is the former editor of the local news section for the Columbus Ledger–Enquirer newspaper. She asserts claims for race discrimination, retaliation, and the intentional infliction of emotional distress against the newspaper's owner and her former employer, R.W. Page Corporation, d/b/a Columbus Ledger–Enquirer ("the Ledger"), and its parent company, Knight–Ridder, Inc. (KRI). Defendants have filed motions for summary judgment.

For the reasons stated in this Order, the Court finds as a matter of law that Plaintiff has failed to make out a *prima facie* case of race discrimination or retaliation

Shortly after she became Metro Editor, Plaintiff became dissatisfied with the job performance of a fellow editor, Tim Turner, a black male. Turner was the Sunday Projects Editor and reported directly to Burbach. Turner was responsible for special in-depth news articles that appeared in the Sunday paper. He also edited two of

---

1. Plaintiff's soon-to-be husband was also hired as a reporter for the Ledger, focusing on state government issues. However, Wayne Wehunt did not report to Plaintiff.

2. Jerry Rutledge and Ben Wright are both black males.

the newspaper's regular columnists. Plaintiff complained to Burbach that Turner was not performing his job adequately, and as a result, she had to assume part of his workload. Burbach eventually sent Turner to a training program in May or June 2001. According to Plaintiff, her Metro desk was responsible for all of the Sunday Projects work during Turner's absence. When Turner returned to work, he still held the title of Sunday Projects Editor. However, Plaintiff contends that he was only required to write and perform some limited editing of two columnists.[3] Turner continued to report to Burbach.

During this same time period, in January 2001, Business Editor Chuck Crouch left his position on a medical leave of absence. The two reporters working under Crouch were reassigned to the Metro desk.

In July 2001, Plaintiff specifically complained to Burbach about the additional duties she had taken on and the lack of help from Turner or Rutledge. She told Burbach that she needed help in motivating Turner and Rutledge, and she states that Burbach told her he would speak to the two men. Plaintiff states that she never noticed any difference in the performance of Turner and Rutledge afterwards and that Burbach never followed up with her about his conversation with the men, although she also admits that she never asked Burbach about it. Plaintiff states that she was prescribed Prozac at the end of July because she was overworked from the extra work placed on her and Burbach's refusal to help.[4]

In September 2001, Plaintiff continued to complain about the lack of assistance from Turner and Rutledge, specifically complaining about her inability to motivate Rutledge. At the same time, the workload at the paper increased, due to coverage of the September 11 terrorist attacks. Again, Burbach told Plaintiff he would speak to Rutledge. Plaintiff does not know if Burbach did so, but believes that he did not because she perceived no change in Rutledge's performance. Burbach states that he had several counseling sessions and conversations with Rutledge.

Plaintiff met with Rutledge in December 2001 and told him at that time that he was not performing his share of the work. She provided him with specific examples. Because the discussion apparently grew tense or hostile, it was ended, and Plaintiff reported it to Burbach shortly thereafter. At that time, Burbach held a meeting with Plaintiff, Rutledge, and Managing Editor Susan Catron. Plaintiff states that Catron said that she thought the conflict between Plaintiff and Rutledge was creating a "wedge" in the newsroom. Plaintiff contends that Burbach announced at that meeting that Plaintiff and Rutledge would "sink or swim" together. This meeting apparently ended with the parties agreeing to try to work together, although Plaintiff characterizes her agreement as reluctant and states that she did not have the opportunity to voice her specific concerns at this meeting or present documentation of Rutledge's performance problems.

Plaintiff spoke with Burbach the following day and suggested to him, based upon

3. While there is some dispute as to the title held by Turner after he returned to work, the parties agree that his duties changed and that he no longer performed the work expected of the Sunday Projects Editor.

4. Defendants also note, however, that in January 2002, Plaintiff's husband was diagnosed with alcoholism, and that Plaintiff testified that prior to his diagnosis, she had been anxious about her husband's drinking.

her assessment of the situation at the Ledger, that she thought it was time for her to move on. She asked him for assistance in finding a position at another KRI paper because she wanted to continue working with KRI and did not, at that time, consider working outside of the KRI organization. Burbach gave her a lead at a paper in Fort Worth, Texas, but Plaintiff was not interested in moving to that area. She therefore did not pursue that opportunity. Around this same time, Plaintiff sought treatment from a psychologist. She remained employed with the Ledger but contends that after she declined to pursue the Fort Worth job, Burbach cut off direct communication with her.

From December 18, 2001 until January 8, 2002, Plaintiff and other editors were on vacation. When Plaintiff and the other employees returned to work in January, Burbach and Catron held a meeting with Plaintiff, Rutledge, Turner, and Ben Wright regarding the Metro desk. According to Plaintiff, Burbach said at the meeting that he "would not hesitate to clear the room of all four" of the employees. At that same meeting, Burbach reiterated the division of job duties and made some reassignments of reporters.

Later that month, Plaintiff and her husband met with Margie Watson, Human Resources Director for the Ledger, raising the same complaints about Turner and Rutledge that she had voiced to Burbach. She also contends that she complained about Burbach's failure to address those complaints. Near the end of January 2002, Plaintiff's husband began short-term disability leave to seek treatment for alcoholism.

Plaintiff states that from January 2002 to March 2002, she was subject to intense scrutiny by Catron and Burbach, while they continued to ignore Turner's and Rutledge's performance problems. At the beginning of March 2002, Plaintiff's husband met with Burbach and Watson about returning to work, at which time he apparently discussed Plaintiff's ongoing complaints about Turner and Rutledge. Plaintiff alleges that her husband was informed that the working conditions would not change. At that time, he remained on short-term disability leave. On the same day as that meeting, Plaintiff became physically ill at work and left early. She met with Watson the following day to discuss taking a leave of absence for psychological reasons. Plaintiff stated that she had been previously diagnosed with major depression by a counselor.

On April 30, 2002, Plaintiff met with Watson to discuss returning to work, although she had not been released by her doctors to do so. Plaintiff states that she had not yet been released because the Ledger had to make "critical" changes in the workplace before it would be healthy for Plaintiff to return. From Plaintiff's perspective, those changes needed to include appropriately disciplining, firing, or reassigning Turner and Rutledge. Watson expressed concern about Plaintiff's readiness to return to work and asked for a leave authorization from her treating physicians. Plaintiff responded that she could not return to work if her complaints were not addressed. Plaintiff alleges that Watson then mentioned a possible "buy out" of Plaintiff's contract. Defendants dispute this and contend that Plaintiff actually contacted Watson the following day requesting a severance package. Plaintiff remained on disability leave, and a severance offer was made on May 15, 2002. According to Plaintiff, this severance package required a full release of all claims of discrimination or retaliation, although

Plaintiff never complained to Burbach or Watson that she felt she was being discriminated against because of race.

After the April 30 meeting with Watson, Plaintiff signed a letter of intent regarding the possible purchase of The City Sun, a newspaper in Bluffton, South Carolina. She remained on short-term disability leave from the Ledger.

On June 5, 2002, Plaintiff's attorney sent a letter to Watson, informing the Ledger that Plaintiff was represented by counsel concerning claims related to race discrimination and intentional infliction of emotional distress. This was the first time that Plaintiff's complaints mentioned race discrimination. According to Plaintiff, the Ledger withdrew any offers of a severance package after it received this letter from Plaintiff's attorney. Later that month, Plaintiff and her husband completed the purchase of The City Sun in Bluffton. On July 15, 2002, Plaintiff and her husband attended the closing on their new home in Bluffton. Plaintiff's husband resigned his position at the Ledger by letter, effective July 26, 2002. The Ledger received a copy of Plaintiff's EEOC charge of discrimination on July 31, 2002, which alleged race discrimination and retaliation.

Plaintiff resigned from the Ledger by letter dated August 6, 2002, stating that her resignation was effective as of August 1, 2002. Plaintiff was aware at the time of her resignation that the Ledger knew of her purchase of The City Sun and her plans to move. When Burbach completed the paperwork for Plaintiff's personnel file on August 16, 2002, he marked that she was ineligible for rehire. Plaintiff speculates that this notation by Burbach "effectively ended her ability to ever become re-employed" with a KRI affiliated newspaper. After Plaintiff officially resigned, Burbach replaced her with Charlotte Atkins, another white female.

Plaintiff contends that Defendants had a diversity policy that resulted in favoritism toward their black employees. Plaintiff alleges that because of this favoritism, the Ledger refused to adequately address the performance of two of its black employees, Jerry Rutledge and Tim Turner. This failure to require higher performance from these black employees created additional work for Plaintiff, which according to Plaintiff, created extreme emotional distress and ultimately resulted in her constructive discharge. She also maintains that she was constructively discharged after being retaliated against for complaining about Turner and Rutledge. Finally, Plaintiff contends that she was paid a lower bonus than Turner, which she attributes to race discrimination. As best as the Court can ascertain from a review of Plaintiff's pleadings and briefs, it appears that Plaintiff is asserting three separate race discrimination claims and a retaliation claim under Title VII and 42 U.S.C. § 1981. These claims are a disparate treatment claim based upon blacks being shown favoritism as to conditions of employment as compared to Plaintiff; a discriminatory constructive discharge claim based upon intolerable working conditions that resulted from favoritism toward black employees; a disparate pay claim arising from Plaintiff receiving a lower signing bonus than a fellow black employee, Turner; and a retaliation claim based upon her constructive discharge after she complained of the poor job performance of fellow black employees. Plaintiff also asserts a tort claim under Georgia law for the intentional infliction of emotional distress.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be

granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

■■■ An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Allen v. Tyson Foods,* 121 F.3d 642, 646 (11th Cir.1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In its review of the record, "[t]he district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences ... in his favor." *United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1437 (11th Cir.1991)(internal quotations and citations omitted).

## DISCUSSION

### I. Plaintiff's Federal Law Claims

■■■ Plaintiff contends that Defendants discriminated against her because of her race (white) and retaliated against her because she complained about it. Title VII of the Civil Rights Act of 1964 prohibits employers from intentionally discriminating against employees based on their race, religion, sex, or national origin.[5] 42 U.S.C.

§ 2000e. When direct evidence of disparate treatment is not available to a plaintiff, a plaintiff must rely upon circumstantial evidence from which an inference of intentional discrimination may be drawn. *Armstrong v. Flowers Hosp., Inc.,* 33 F.3d 1308, 1313 (11th Cir.1994).

The Supreme Court established an analytical framework for evaluating discrimination claims based on circumstantial evidence in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that formulation, the plaintiff has the initial burden to set forth a *prima facie* case of discrimination. *Id.* at 802, 93 S.Ct. 1817. If the plaintiff succeeds in proving a *prima facie* case of discrimination, he has established a presumption of the unlawful conduct. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). ("The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for plaintiff's rejection."). The defendant then has the burden of articulating a legitimate, nondiscriminatory reason for the challenged employment action. *See id.* at 254, 101 S.Ct. 1089 (emphasizing that defendant's burden is one of production: "The defendant need not persuade the court that it was actually motivated by the proffered reasons."). If a legitimate, nondiscriminatory reason is articulated by the defendant, the plaintiff then has the ultimate burden of proving the reason is a pretext for unlawful discrimination. *Id.* at 256, 101 S.Ct. 1089.

### A. Plaintiff's Disparate Treatment Claim

■■■ Plaintiff has pointed to no direct evidence in support of her disparate treat-

---

5. Plaintiff has also brought her claims of discrimination and retaliation under 42 U.S.C. § 1981. The Eleventh Circuit has held that "such ... claim[s] may be analyzed under the *McDonnell Douglas* structure developed in Title VII suits." *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982).

ment claim. She simply contends that Defendants passionately pursued diversity, particularly racial diversity, to the extent that they ignored the poor performance of their black employees. This "favoritism," according to Plaintiff, resulted in white employees such as herself being subjected to working conditions that were worse than those the black employees had to endure. Plaintiff contends that this circumstantial evidence shows that she was discriminated against based upon her race. When a plaintiff alleges that she has been subjected to disparate treatment based upon race, the elements of a *prima facie* case are: (1) plaintiff belongs to a protected class; (2) plaintiff was subjected to an adverse job action; (3) plaintiff's employer treated similarly situated employees outside the classification more favorably; and (4) plaintiff was qualified to do the job. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997).

## 1. Plaintiff's *Prima Facie* Case

Plaintiff has clearly satisfied two elements of the *prima facie* case: she is a member of a protected class and was qualified for the position that she held. Defendants contend, however, that Plaintiff cannot meet either of the remaining requirements, and therefore, she has failed to establish a *prima facie* case of disparate treatment. Based upon a review of the record, the Court finds that Plaintiff has failed to identify a similarly situated employee who was black and who was treated more favorably than she was treated. The Court also finds that the undisputed facts establish that Plaintiff was not

subjected to any adverse employment action. Therefore, Plaintiff cannot satisfy two of the elements of the *prima facie* case, and Defendants' motions for summary judgment must be granted as to Plaintiff's disparate treatment claim.

### a. Similarly Situated Employees

 To make out a *prima facie* case, Plaintiff "must show that [her] employer treated similarly situated employees outside [her] classification more favorably than herself." *Holifield*, 115 F.3d at 1562. Plaintiff must show that she and the comparator employees "are similarly situated in all relevant aspects." *Id.* It is crucial to analyze carefully whether the comparator employees are similarly situated. *Marshall v. Western Grain Co., Inc.*, 838 F.2d 1165, 1168 (11th Cir.1988). This analysis should include an evaluation of whether "the plaintiff is matched with a person or persons who have *very similar job-related characteristics* and who are *in a similar situation* to determine if the plaintiff has been treated differently than others who are similar to him." *MacPherson v. University of Montevallo*, 922 F.2d 766, 774 (11th Cir.1991) (emphasis added).

 In this case, Plaintiff identified Tim Turner as her comparator.[6] The Court finds that Turner is not a valid comparator because the job-related characteristics of his position were not similar to those of the Plaintiff, and he was not in a situation similar to Plaintiff. Turner, as Sunday Projects Editor, was responsible for special news features appearing in the Sunday edition of the newspaper. Unlike Plaintiff, he played no role in overseeing the day-to-

---

6. Plaintiff originally asserted that Rutledge was also her comparator. Rutledge was an Assistant Metro Editor and worked as Plaintiff's subordinate; he clearly had different job duties and cannot be considered similarly situated to Plaintiff. Plaintiff conceded during oral argument on Defendants' motions that Rutledge is not an appropriate comparator.

day reporting or editing of the local news except as it related to these special reports. He also edited two columnists. Plaintiff's job responsibilities did not include editing columnists. Unlike Turner, Plaintiff focused on the daily local news; she supervised two assistant editors who focused on the daily local news; and she also supervised the local news reporters. In fact, Plaintiff was actually compensated at a higher salary than Turner. The only similarity between Plaintiff's position and Turner's was that they both reported directly to the Executive Editor, Burbach, and they both were news editors. Considering the differences in their job responsibilities, the Court finds that Turner is not a valid comparator.

■ Even if Plaintiff could establish that Turner was a valid comparator, she has failed to show how he received more favorable treatment than she received under similar circumstances. Plaintiff has produced no evidence that she was disciplined for conduct for which Turner (or any other black employee for that matter) was not disciplined. In fact, she admits that she was never disciplined at the Ledger. Although Plaintiff states that she was threatened with discharge, her testimony reveals that at the times Burbach mentioned termination, Rutledge was also threatened with termination, and in another instance, Plaintiff, Turner, Rutledge, and Wright were all threatened with termination.[7] Plaintiff has produced no evidence that she was demoted while other similarly situated minority employees were not. In fact, Turner had many of his duties stripped from him after Plaintiff complained about his work. Finally, Plaintiff has pointed to no black employee who encountered management difficulties similar to those she complained about and who was given more support than she received. Without a proper comparator, Plaintiff cannot establish a *prima facie* case of disparate treatment, and Defendants are therefore entitled to summary judgment on this claim. *Holifield*, 115 F.3d at 1562 ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.").

■ The core of Plaintiff's claim is that Turner and Rutledge did not receive the kind of discipline that Plaintiff thought was warranted, and she suffered because of it. The role of this Court is to address whether illegal discriminatory motive underlies a challenged employment decision; it is "'not to act as a super personnel department that second-guesses employers' business judgments."' *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (quoting *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1254 (11th Cir.2000)). While one may sympathize with the stress caused to Plaintiff by the extra workload she received due to Defendants' arguably ineffective motivation of Turner and Rutledge, Plaintiff has produced no evidence to support her claim that she was treated differently because of her race.

### b. Adverse Employment Action

■ Even if Plaintiff was able to establish that she was treated differently from a similarly situated black comparator,

---

7. Plaintiff alleges that at one meeting, Burbach told her and Rutledge that they would "sink or swim" together. At another meeting, Plaintiff states that Burbach informed Plaintiff, Turner, Rutledge, and Wright that he would not hesitate to "clear the room" of all four of them.

she must also show that she was subjected to an adverse employment action. Plaintiff has produced no evidence that she was fired, demoted, transferred, formally disciplined, or subjected to a reduction in responsibilities or pay. She claims that she had to assume additional work assignments to take up the slack for the poor performance of other employees. Although an adverse employment action need not rise to the level of an ultimate employment decision to be actionable, *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998), the employer's conduct must create a "serious and material" change to the terms, conditions, or privileges of the employee's employment. *Davis v. Town of Lake Park Florida*, 245 F.3d 1232, 1239 (11th Cir. 2001). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

Although it is not entirely clear from Plaintiff's pleadings and briefs, it appears that Plaintiff's claim is in the nature of a work assignment claim: she had to work harder because black employees were allowed to work less. The Eleventh Circuit has recognized that such "work assignment claims strike at the very heart of an employer's business judgment," and therefore, it would be "unusual" for a change in work assignments to be so "substantial and material that it does indeed alter the terms, conditions or privileges of employment." *Id.* at 1244–1245. The Court finds that Plaintiff has failed to produce suffi-

cient evidence from which a reasonable jury could conclude that she was subjected to an adverse employment action. Therefore, Defendants are entitled to summary judgment on Plaintiff's disparate treatment claim.[8]

**B. Plaintiff's Discriminatory Discharge Claim**

■ A liberal reading of Plaintiff's contentions reveals that Plaintiff may actually be asserting a discriminatory discharge claim. However, that claim is also meritless because she cannot make out a *prima facie* case. The elements of the *prima facie* case for unlawful termination based on race are: (1) plaintiff was a member of a protected class; (2) plaintiff was qualified for the job; (3) plaintiff was terminated despite his qualifications; and (4) plaintiff was replaced by a person outside the protected class. *Noble v. Ala. Dep't of Envtl. Mgmt.*, 872 F.2d 361, 365 n. 3 (11th Cir.1989). It is undisputed that Plaintiff was replaced with another white female. Therefore, she was not replaced by someone outside of her protected class. Consequently, she has failed to satisfy this element of a *prima facie* discharge claim. Even if she could satisfy that element, she has produced no evidence from which a reasonable jury could conclude that she was in fact terminated. She acknowledges that she was not fired, but she argues that she was constructively discharged.

■ "The threshold for establishing constructive discharge ... is quite high." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir.2001). Courts

---

8. To the extent that Plaintiff contends that the adverse employment action supporting her disparate treatment claim is a "constructive discharge," the Court finds that Plaintiff was not constructively discharged for the reasons described below. *See Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Miller v. Tex. State Bd. of Barber Exam'rs*, 615 F.2d 650, 652 (5th Cir.1980).

employ an objective standard in evaluating constructive discharge claims, without consideration of subjective feelings of the plaintiff. *Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1450 (11th Cir.1998). The general rule is that the plaintiff must show "that working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.'" *Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir.1997) (quoting *Thomas v. Dillard Dep't Stores, Inc.,* 116 F.3d 1432, 1433–34 (11th Cir. 1997)). This standard "is higher than the standard for proving a hostile work environment.... [The Eleventh Circuit] has required pervasive conduct by employers before finding that a hostile work environment existed *or* a constructive discharge occurred." *Hipp,* 252 F.3d at 1231 (emphasis added).

 Plaintiff states that the following conditions amounted to her constructive discharge: (1) she was required to do more work, taking on the responsibilities of Sunday Projects Editor and Business Editor; (2) her requests for assistance with her workload were ignored, specifically her requests regarding managing Turner and Rutledge; (3) she was disciplined for the failures of "certain minorities" working for her (presumably Turner and Rutledge), although she was given no effective authority to discipline them herself; (4) she was never paid additional compensation for her additional duties, although black co-workers were routinely given bonuses for performing extra duties; (5) she was threatened with termination if she could not get along with Turner and Rutledge; and (6) after Plaintiff suggested

that she find a job elsewhere, Burbach discontinued all one-on-one communication with her.

Some of these allegations by Plaintiff are factually unsupported: (1) there is no evidence that Plaintiff was ever disciplined or ever received any negative performance evaluations; (2) Plaintiff cites *no* evidence to support her claim that black co-workers received bonuses for doing additional work;[9] and (3) even by Plaintiff's own account, the two occasions on which she testified that her possible termination was raised, she was told that she and Rutledge would "sink or swim" together and Burbach threatened to fire three other employees in addition to her; in other words, on both occasions, Plaintiff was not singled out and threatened with termination.

 Even when viewed in the light most favorable to the Plaintiff, the circumstances of Plaintiff's employment do not amount to conditions "so intolerable that a reasonable person in [Plaintiff's] position would have been compelled to resign." *Poole,* 129 F.3d at 553 (internal quotation marks omitted). Title VII and the other federal employment statutes do not guarantee employees "a stress-free working environment." *Hipp,* 252 F.3d at 1233. Because no reasonable jury could determine from the facts that Plaintiff was constructively discharged, she has failed to show that her employment was terminated by Defendants. Therefore, she cannot make out a claim for discriminatory discharge.

## C. Disparate Pay

Plaintiff claims that she was paid a $3,000.00 signing bonus when she accepted

---

9. As noted earlier, plaintiff earned more per year than Rutledge and Turner and had received two pay raises during her tenure. Turner received no raises during that same time period.

the job with the Ledger and that Tim Turner received a $5,000.00 signing bonus. Although she apparently was satisfied with the level of her compensation at the time she was hired, she has reevaluated the Ledger's generosity since she became disgruntled. She now contends that Turner was paid $2,000.00 more than she was paid based upon the fact that he is black and she is white.[10]

### 1. Direct Evidence of Discrimination

■ Plaintiff contends that direct evidence exists supporting her disparate pay claim. Direct evidence of discrimination is " 'evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption.' " *Burrell v. Bd. of Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir.1997). Plaintiff maintains that Burbach admitted in his deposition testimony that Turner received a higher bonus than Plaintiff because he was black. Obviously, if Burbach gave such testimony, it would be considered direct evidence of discriminatory intent. Having reviewed Burbach's deposition testimony, however, the Court finds that Plaintiff's interpretation of it is wrong.

The issue of Plaintiff and Turner's bonuses is raised at two different times during Burbach's deposition. He first testified, in response to counsel's questions regarding the source of the funds for Turner's bonus:

> My understanding was that there was some-that when we try to recruit people we want, we try to find money. If we need to pay money to get them, we try to find it wherever we can. Sometimes that's locally. Sometimes it's through Knight–Ridder....

. . . .

> ... Jacqui Love Marshall was the diversity officer for Knight–Ridder, and we occasionally had access to money from the diversity office to help us hire people who we really wanted. In this case, you know, Tim is black, and I did go to Jacqui Love Marshall for this bonus.

Burbach Dep. at 155.

Later, counsel pursued this line of questioning again:

Q. Can you tell me why you gave Tim Turner a larger signing bonus than Judy Wehunt?

A. No. I don't remember the reasoning.

Q. Did the fact that there was Knight–Ridder diversity money available for Tim Turner and that there was no such diversity money available for Judy Wehunt have any bearing on your decision to pay Tim Turner a higher signing bonus?

A. Probably. Yeah. I can't-I don't remember thinking about it in those terms, but . . . .

Burbach Dep. at 269.

■ Construing Burbach's testimony in a light most favorable to Plaintiff as required at this stage of the proceedings, the most that he admitted was that the source of Turner's bonus was KRI's diversity funds and that the fact that this money was available "probably" resulted in Turner getting a larger bonus, but at the time the decision on the amount of the bonus was made, he did not recall thinking

10. Plaintiff conveniently ignores the fact that at the time she resigned her employment she earned $52,624.00 per year and had received two raises during her employment, whereas Turner earned $50,024.00 per year and received no raises during that same period.

about it in those terms. The Court finds that while this testimony may be circumstantial evidence of discrimination, it does not rise to the level of direct evidence of discriminatory intent.

"If an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1266 (11th Cir.1999). At best, that is the evidence that Plaintiff has produced here. To arrive at the conclusion that Burbach paid Turner a higher bonus because he was black requires inferring it from the fact that: (1) "diversity funds" were available; and (2) Burbach used diversity funds to pay for Turner's bonus. The conclusion requires an inference. Therefore, the Court must analyze Plaintiff's claim using the *McDonnell Douglas* framework.

### 2. Plaintiff's *Prima Facie* Case

 When a plaintiff alleges that she has received less compensation as a result of intentional discrimination, she must first establish that she was paid less than a member of a different race was paid for work requiring substantially the same responsibility. *Pittman v. Hattiesburg Mun. Sep. Sch. Dist.,* 644 F.2d 1071, 1074 (5th Cir.1981);[11] *see also Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1530 (11th Cir.1992). Plaintiff has identified Turner as a similarly situated employee who received a higher signing bonus. However, as explained previously in this Order, Plaintiff and Turner had different job responsibilities and therefore were not similarly situated. Moreover, at the time they were hired and decisions were made as to their signing bonuses, they were not similarly situated.

When Turner was recruited by the Ledger, he was employed at a newspaper in Jackson, Tennessee; whereas when Plaintiff was hired, she had recently been asked to resign her position at her former employer. Turner was required to relocate from Tennessee to Columbus; Plaintiff moved to Columbus from Macon. When he hired Plaintiff, Burbach believed that he would also need to offer her husband a position at the Ledger to convince Plaintiff to accept the job offer and testified that he created a position for Wayne Wehunt for that reason. Burbach did not need to incur that type of extra expense when assessing Turner's signing bonus.

Based on the foregoing, the Court finds that Plaintiff has failed to identify a similarly situated individual outside the protected class who received a higher signing bonus. Therefore, she has failed to make out a *prima facie* case for discriminatory pay. Accordingly, Defendants' motions for summary judgment are also granted as to this claim.[12]

### D. *Retaliation*

 In addition to her race discrimination claims, Plaintiff contends that when she continued to complain about the deficient performance of Turner and Rutledge,

---

**11.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

**12.** The Court notes that even if Plaintiff made out a *prima facie* case, the Defendants have articulated legitimate, nondiscriminatory reasons for their actions, and Plaintiff has failed to produce sufficient evidence from which a reasonable jury could conclude that Defendants' reasons were pretextual. Therefore, Defendants are entitled to summary judgment for this reason also. *Cooper v. Southern Co.,* 390 F.3d 695, 735 (11th Cir.2004).

Defendants retaliated against her by making her work conditions intolerable, thus constructively discharging her. To establish a *prima facie* case for unlawful retaliation, an employee must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) that there was a causal link between the protected activity and the adverse employment action. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir.2000).

The Court has previously found that Plaintiff has not suffered an adverse employment action. Therefore, Plaintiff's retaliation claim must fall because of Plaintiff's failure to produce sufficient evidence of this essential element of a *prima facie* retaliation claim.

Moreover, Plaintiff has also failed to produce sufficient evidence from which a reasonable jury could conclude that she engaged in protected activity, another essential element of a retaliation claim. The anti-retaliation provisions of Title VII protect two different kinds of employee activity: participation and opposition. *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir.2000). Pursuant to the participation clause, an employer may not retaliate against any employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.; see also* 42 U.S.C. § 2000e–3(a). Under the opposition clause, an employer may not retaliate against an employee who "has opposed any practice made an unlawful employment practice by this subchapter." *Total Sys.*, 221 F.3d at 1174; *see also* 42 U.S.C. § 2000e–3(a).

The participation clause protects employees from retaliation for activities which occur in connection with or after the filing of a formal charge of discrimination with the EEOC. *Total Sys.*, 221 F.3d at 1174. Plaintiff filed an EEOC charge at the end of July 2002, which defendants received on July 31, 2002, while she was still on disability leave. Plaintiff informed them of her resignation, effective August 1, 2002, on August 6, 2002. Clearly, Plaintiff cannot proceed under the participation clause. *Id.* at 1174 n. 3.

Accordingly, Plaintiff must show that she engaged in opposition conduct. An employee can establish a *prima facie* case of retaliation under the opposition clause if the employee notifies her employer of an unlawful employment practice in which she has a good faith, reasonable belief that her employer was engaged. *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir.1997). According to Plaintiff, she complained repeatedly about the poor job performance of Turner and Rutledge, who were black. However, no evidence exists that she ever complained that their poor performance was tolerated because they were black.[13] In short, she never complained to her superiors of race discrimination. In fact, she explains that she did not do so because she was concerned that if she did complain of race discrimination, such complaints would not be well received by her diversity-conscious superiors. Plaintiff argues that she should be excused from actually opposing the employment practice which she contends was unlawful (i.e., race discrimination) because the Defendants should somehow be presumed to know that they were

---

**13.** *See* Pl.'s Dep. at 199, 200–01, 202, 203–05, 231–32. Plaintiff also admits that the first time she used the words "race discrimina-tion" with Margie Watson was in her resignation letter. *Id.* at 235.

engaged in race discrimination.[14]

 Plaintiff's complaints, which lacked any mention of discrimination, were not statutorily protected activity. *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1075 (11th Cir. 1995) ("Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII."). At a minimum, an employee must communicate to her employer her belief that discrimination was occurring. It is not enough to simply complain in a racially neutral way about an employer's practices, and then expect the employer to speculate as to whether such complaints may be motivated by an employee's subjective and undisclosed belief that the employer was engaged in race discrimination. Since Plaintiff did not engage in statutorily protected activity, she cannot establish a *prima facie* case of unlawful retaliation. Accordingly, Defendants' motions for summary judgment are granted as to this claim.

## II. Plaintiff's State Law Claim for Intentional Infliction of Emotional Distress

In addition to her federal law claims, Plaintiff asserts a state law claim for the intentional infliction of emotional distress. Having granted Defendants' motions for summary judgment as to each of Plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim.

## CONCLUSION

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to each of Plaintiff's federal claims of discrimination and retaliation under Title VII and 42 U.S.C. § 1981.[15] Plaintiff's remaining state law tort claim is dismissed without prejudice.

---

14. Plaintiff's evidence of this knowledge on the part of Defendants is that they allegedly began to retaliate against her. Plaintiff's logic is completely circular, since in her effort to make a *prima facie* showing of retaliation, she concludes that Defendants must have known she was opposing their discrimination because they began to retaliate against her, before she has established that Defendants had reason to retaliate against her.

15. Defendant KRI also moved for summary judgment on the grounds that it is not a proper Defendant to this suit because the Ledger, and not KRI, was Plaintiff's sole employer, and for lack of personal jurisdiction. Because the Court has decided that Defendants are entitled to summary judgment on Plaintiff's substantive Title VII and § 1981 claims, the Court finds it unnecessary to address these arguments by KRI.