[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 31, 2008
THOMAS K. KAHN
CLERK

_____

No. 05-15538

_____

D. C. Docket No. 04-00755-CV-CC-1

GEETHA SAMPATH,

Plaintiff-Appellant,

versus

IMMUCOR, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(March 31, 2008)**

Before BIRCH, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Plaintiff-appellant, Geetha Sampath, appeals the district court's grant of

summary judgment in favor of defendant-appellee, Immucor, Inc., as to Sampath's employment discrimination claims. Sampath argues that the district court ignored evidence that would have demonstrated pretext and improperly determined that her demotion did not constitute an adverse employment action. We AFFIRM.

## I. BACKGROUND

In 1999, Sampath began work as a contract consultant for Immucor. She was hired as supervisor of software in the information systems ("IS") department in July 2000. In August 2001, she took the position of Director of the IS department. She became pregnant the following November and immediately informed her supervisor, Steve Ramsey, Immucor's chief financial officer.

Sampath received her first performance evaluation from Ramsey in December 2001. Although Ramsey told Sampath orally that he was pleased with her work and had received only good reports from others, his written evaluation rated her performance as below expectations. Ramsey explained that this discrepancy arose from the fact that the written evaluation was based upon the performance of the entire IS department.

In May 2002, Sampath was restricted to bed rest by complications with her pregnancy. Around this time, Ernst & Young was preparing to perform its annual audit of Immucor. This audit included an examination of software applications to

ensure the accurate processing of financial information. With Sampath at home, Ramsey assigned Casey Brost, an IS engineer, to coordinate the software audit.

After an initial meeting with Jill Cleaveland and Sara Baumhofer, the software auditors, Brost assigned responsibilities within the IS department for providing information required by the auditors. He introduced the auditors to Vicki Flier, a member of the IS team, and to Sampath, who had reported to work for a few hours on her own initiative to help answer questions the auditors might have about the change control documentation for the BAAN financial software system, about which she knew more than anyone in the department. Flier and Sampath showed the auditors the Helpdesk and Issue Log, both documents used by Immucor to track changes made to the BAAN system. Neither Flier nor Sampath restricted the auditors' access to information during this demonstration. However, because the information contained in the Helpdesk and Issue Log was extensive, the auditors requested a summary of the software changes that had a financial impact.[1] Brost testified that he instructed Sampath and Flier to create a summary. Flier testified that, at Sampath's instruction, she created a list of 11 software

---

[1]According to Cleaveland, when the auditors indicated that they would need a list of "all the changes from January to present in the BAAN application so that [they could] choose [their] sample from that selection," Sampath showed them the Helpdesk and Issue Log on her computer, and then, because it was so extensive, volunteered to put the information in a "more readable format." R-Exh. 117 at 39-40.

changes entitled "Summary of Financial Changes in Baan IV C4." R-Exh. 111 at 91, 104, 120, Exhs. 2, 3. Flier further testified that she culled the information to be included in the Summary on the ground she had clarified with the auditors at the beginning: whether there was a "finance impact" related to the change. Id. at 77-78. After creating the Summary, Flier emailed it to both Brost and Sampath for review. Sampath, who was back at home, made only a few minor changes to wording and sent the document on to Brost only twenty minutes later, asking him to review it. Brost testified that he did not believe it was his responsibility to review the Summary for more than "form" and "structure." R-Exh. 116 at 153, Exh. 62. Accordingly, four minutes after receiving Sampath's revision and having had the document for just under half an hour, Brost responded to Flier's original message that the Summary looked fine. Flier gave it to the auditors.[2] The auditors tested the changes and found controls to be adequate.

Sampath began her maternity leave on 16 June 2002. On 1 July, Ramsey announced a reorganization of the IS department under which Sampath would

---

[2]Cleaveland testified that, when they were handed the Summary, she and Baumhofer had understood it to be a summary of the entire population of individual changes, not just a summary of overall changes made to BAAN. She also testified that she and Baumhofer had specifically asked Flier or Sampath whether the document included all changes and that they had confirmed that it did. Flier and Sampath, on the other hand, both testified that they believed the auditors had wanted the information on changes culled based on whether there was any financial impact. Flier also testified that she gave the auditors the Helpdesk, the modification specification book containing every change made to the system, and the data migration protocol.

manage the software side and Brost would manage the hardware side. Ramsey explained that the reorganization was only temporary and was designed to address particular needs for improvement within the department. He stated that he expected Sampath would reassume responsibility for both sections when she returned from maternity leave. Her salary, benefits, and hourly work requirements were unchanged by the reorganization. Her job title also remained unchanged. Although Sampath contends that her title was changed from Director of IS to Manager of Software, she never actually worked as Manager because she was terminated while she was still on maternity leave. Also, she acknowledges that both her resume and her job application for the position she currently holds list her last position at Immucor as Director of IS.

In mid-July, with the financial audit in full-swing, the auditors informed Lynne Johnson, Assistant Controller for Immucor, that they required additional support for $500,000 capitalized as software costs attributable to the program changes made to BAAN. Johnson called Sampath at home. The record accounts of their conversation vary, but that Johnson reported her account of the conversation to Ramsey by memo is not disputed. Johnson's memo describes how Sampath told Johnson she had worked many hours (over a weekend, etc.) reviewing and revising the Issue Log for the auditors because she was concerned

5

that it contained information that would look bad to an IS professional. Johnson reported that Sampath had suggested that before Johnson gave a copy of the Issue Log to Ernst & Young, she should "hide" the "Reason" column on the spreadsheet. R-Exh. 114 at Exh. 50.

Ramsey testified that Johnson's report of this conversation acted as a "red flag" and that he called the auditors to ask for a copy of all information that had been provided regarding software.[3] R-Exh. 115 at 87, 152. The only thing Ernst & Young gave him was a copy of the Summary. Ramsey and Martin Pinne, the software audit manager from Ernst &Young, sat down together and compared the Summary to the Helpdesk and Issue Log. The two of them concluded that there were major changes not reflected in the Summary. Based on these discrepancies, Pinne told Ramsey that the auditors would need to retest the IS department controls.

After discovering the omissions in the Summary, Ramsey asked Cleaveland which member of the IS department had provided her the document. She told him that it had come from Flier. Ramsey explained that because Sampath was the expert on BAAN and directly supervised Flier, he believed the document to have

---

[3]Ramsey repeatedly clarified that his decision to terminate Sampath was not based in any way on Johnson's memo, which served only as a "red flag" initiating his further investigation. R-Exh. 115 at 151-52, 284.

6

been created at Sampath's direction and that she was responsible for the omissions.

During the re-audit, Flier emailed Ramsey to explain that Cleaveland and Baumhofer had requested only changes that had a financial impact and that Ernst & Young had been sent the Helpdesk along with the Summary. Flier also explained that Sampath had created a report from the Helpdesk based on the criteria given by the auditors. Ramsey testified that he never discussed this email with Flier, that he did not believe she was "capable" of creating the Summary on her own, and that he did "not trust [her]." R-Exh. 115 at 219, 229, 235. Accordingly, he did not consider her email in making his decision regarding Sampath.

On 6 August 2002, Brost sent Ramsey a memo stating that Sampath and Flier had been tasked with gathering the required information related to BAAN. In the memo, he also, incorrectly, stated that he had not reviewed the Summary before it had been given to the auditors. He later sent another memo to Ramsey explaining that Ernst & Young had expressed their discomfort in dealing further with Sampath, but noted that they were quite willing to trust information provided by him. Ramsey testified that he did not rely on the information in either of Brost's memos when he made his determination about Sampath because he considered it to be "self-serving." Id. at 181-82. Ramsey also explained that,

7

although he was aware that Brost had actually reviewed the Summary before it had gone to the auditors, he was convinced, given Brost's limited experience with BAAN, that Brost's review had been only "cursory." Id. at 188.

The re-audit showed no significant problems with Immucor's controls. Afterwards, according to Cleaveland's deposition, during a 9 August 2002 conference call with Ramsey and the other auditors, Cleaveland told Ramsey that she believed the auditors had initially been given incomplete information. She also explained that, because Sampath had been through audits before, and because the auditors had clarified which information they wanted, they did not see how Sampath could not have known that she had not given them everything they requested. R-Exh. 117 at 230. Ramsey testified that Cleaveland told him, during this call, that she thought Sampath had steered the auditors away from the Helpdesk and Issue Log with the Summary.[4] R-Exh. 115 at 137. He explained

_____

[4]Sampath disputes this. However, as the Magistrate Judge correctly observed, although Sampath makes much of discrepancies in testimony regarding the 9 August conference call, the actual differences come to only minor variations in expression. Although Cleaveland never testified specifically that she had told Ramsey she believed she had been "steered away" from the Helpdesk data, she did explain, in answer to a question regarding her beliefs about Sampath's intent, that she had told Ramsey she could not imagine that Sampath didn't realize she was giving the auditors less than complete information. R-Exh. 117 at 229-30. This is consistent with Ramsey's statement, albeit worded slightly differently. It is certainly not a denial thereof. Similarly, Cleaveland's testimony that she told Ramsey the auditors "did not feel like [they] were given what [they] were asking for from this . . . whole situation," id. at 226, and that they "needed . . . to check into every avenue that [they] felt possible that [Sampath] or [Flier], for that matter . . . could have done," id. at 228-29, is not inconsistent with the assertion that she had told him "Sampath was responsible for misleading the auditors." Appellant's Br. at 33. Finally, although Cleaveland's testimony (taken over two years after the conversation at issue) does not

8

that he then concluded, based on "[his] investigation and discussions with Ernst & Young," that Sampath had given the auditors materially incomplete information, and that she needed to be terminated for that reason. Id. at 152.

Ramsey terminated Sampath's employment on 16 August 2002. He explained that he did not also terminate Flier because he believed her involvement had been only "minor." Id. at 280. Similarly, he did not terminate Brost because he believed Brost's review of the Summary had been only "cursory." Id. at 226, 280. Ramsey promoted Brost to replace Sampath in her original position on 2 September 2002.

After pursuing a charge through the EEOC, Sampath filed a complaint against Immucor under Title VII, 42 U.S.C. § 2000e et seq. She complained that she had been discriminated against because she was pregnant. After receiving a report and recommendation from the magistrate judge, the district court found that Sampath had failed (1) to show that she had suffered an adverse employment action during the restructuring of the IS department, and (2) to rebut the legitimate non-discriminatory reason given by Immucor for her termination – that Ramsey believed Sampath had intentionally provided materially incomplete information to

---

reflect that she ever specifically told Ramsey that Ernst & Young would, from then on, treat all information received from Sampath with suspicion, she did testify that she told him that Ernst & Young would "treat everything kind of under a microscope." R-Exh. 117 at 229.

the auditors. The district court therefore granted summary judgment in favor of Immucor.

On appeal, Sampath argues that (1) the record shows Ramsey's reasons for terminating her were pretextual because she was not actually responsible for the Summary and therefore Ramsey could not have held a good-faith belief in the legitimacy of his reasons; (2) other employees – particularly Brost and Flier – were sufficiently similarly situated to Sampath for the purpose of demonstrating disparate treatment; and (3) her assignment during the temporary reorganization of the IS department constituted a separate adverse employment action.

## II. DISCUSSION

We review a district court's grant of summary judgment de novo. Durley v. APAC, Inc., 236 F.3d 651, 655 (11th Cir. 2000). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In examining the record, we view the evidence in the light most favorable to the non-moving party." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004).

For a pregnancy discrimination claim, we use "the same type of analysis used in other Title VII sex discrimination suits." Armindo v. Padlocker, Inc., 209

F.3d 1319, 1320 (11th Cir. 2000) (per curiam). As in other Title VII cases, a plaintiff may use either direct or circumstantial evidence to establish disparate treatment discrimination. Wilson, 376 F.3d at 1085.

When a disparate treatment claim is supported by circumstantial evidence, we evaluate it according to "the framework established . . . in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981)." Wilson, 376 F.3d at 1087. Thereunder, a plaintiff must first establish a prima facie case of discrimination.[5] Id. This creates a rebuttable presumption of illegal action which shifts the burden to the employer to produce one or more legitimate, non-discriminatory reasons for the offending actions. Id. Production of a legitimate, non-discriminatory reason shifts the burden of production back to the plaintiff to offer evidence that the proffered reason is, in fact, pretext for illegal discrimination. Id. To show pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

---

[5]A prima facie case of discrimination is established when a plaintiff shows that she: (1) was a member of a protected class, (2) was qualified for the job she held, (3) suffered an adverse employment action, and (4) suffered from a differential application of work or disciplinary rules. Spivey v. Beverly Enters., Inc., 196 F.3d 1309, 1312 (11th Cir. 1999). Sampath was pregnant and thus protected against discrimination on the basis of her sex, as defined under 42 U.S.C. § 2000e(k). There is no dispute over her qualifications for the job she held. She was discharged. No one else involved with the production of the Summary was discharged. Finally, Sampath was replaced by Brost, who was not pregnant. Immucor does not dispute that Sampath has thereby established a prima facie case of pregnancy discrimination.

11

the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted). Ultimately, if "the proffered reason is one that might motivate a reasonable employer, [the plaintiff] must meet that reason head on and rebut it. Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

A. Termination

In this case, rather than disputing Sampath's establishment of a prima facie case of discrimination, Immucor asserts that Ramsey terminated Sampath for a legitimate, non-discriminatory reason: providing incomplete and misleading information to the Ernst & Young auditors. Therefore we are left to determine whether Sampath has shown that this reason was actually pretext for discrimination based on her pregnancy.

Initially, we observe that most of Sampath's arguments address the accuracy of Ramsey's determination that she was materially involved in the audit rather than Ramsey's good-faith belief regarding her involvement. She points out, for instance, that Brost had ample opportunity to review the Summary before it went to the auditors and that Flier was largely responsible for the Summary's creation. However, the question is not whether Brost or Flier were more responsible for

12

inaccuracies or incompleteness than Sampath, but whether Ramsey honestly believed that Sampath was primarily responsible. Sampath's evidence of the greater involvement of Brost and Flier does not rebut head on Ramsey's testimony that he believed (1) that Brosts's review was only cursory and (2) that Flier was incapable of having generated the Summary on her own. See id. at 1030. Sampath points to no evidence to establish that Ramsey had actual knowledge of the precise level of involvement of either Brost or Flier. Accordingly, Sampath fails to show discriminatory intent by pointing out Ramsey's disparate treatment of Brost and Flier. See Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1186 (11th Cir. 1984) ("If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown.") (quotation and alteration omitted).

Sampath also attacks the legitimacy of Ramsey's belief that information was intentionally kept from the auditors. She focuses on two primary pieces of evidence: the title of the Summary and Flier's email to Ramsey. However, neither makes it impossible for Ramsey to have believed that the Summary was intended to keep information from the auditors. To the contrary, first, the term Summary is ambiguous. It could have indicated a report containing a summarized listing for each change, or a shorter list of only the most important changes according to

13

certain criteria. Second, nothing in Flier's email necessarily precludes a belief that the Summary was intended to hide information. Additionally, the information in the email regarding what had been provided to the auditors directly conflicts with what Ramsey had been told by Pinne, Cleaveland, and even Johnson (an Immucor employee).[6] Finally, the record reflects that the auditors told Ramsey that they had attempted to confirm that the Summary included a list of the total population of changes, that they had been assured by Sampath or Flier that it did, and had later learned that it actually had not.

The evidence to which Sampath points also fails to establish that it was impossible for Ramsey in good faith to have believed that Sampath was responsible for the missing information. Although Ramsey did know that Sampath was not on site during the majority of the audit, he testified that he believed Flier was working under Sampath's close direction. Sampath points to no evidence that Ramsey had actual knowledge contradicting this belief. Further, Sampath was herself in the office for several hours while the auditors were present and Ramsey had received a report from Johnson, whether true or not, that Sampath had spent several hours working on a document for the auditors. As for Brost, although

---

[6]Although Johnson and Sampath's accounts of their phone conversation vary, they agree that Johnson called Sampath because the auditors claimed not to have all the information they needed.

14

Ramsey was aware that Brost had reviewed the Summary, he also understood that Brost's knowledge of BAAN was limited, thereby leading to Ramsey's belief that Brost's review of the Summary had been only cursory. Finally, the record shows that the auditors explained to Ramsey that they did not see how, given Sampath's extensive history of participating in Ernst & Young's previous audits of Immucor, she would not have known the Summary did not contain all the requested information. R-Exh. 117 at 226, 230.

Similarly, the record fails to support Sampath's assertion that it was Ramsey who first suggested to the auditors that Sampath was responsible for withholding information, thereby biasing his own investigation. The discrepancies in the various accounts of the 9 August conference call are minor and insufficient to create a question of fact as to whether Ramsey actually believed Sampath had withheld information. For all of these reasons, we agree with the district court that Sampath failed to point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" sufficient to rebut the legitimate reasons given by Immucor for her termination. See Combs, 106 F.3d at 1538; Chapman, 229 F.3d at 1030.

B. Departmental Reorganization

Sampath also argues that her reassignment as manager of the software side

15

of the IS department during its temporary reorganization constituted an adverse employment action, and thereby provides a separate ground for her discrimination claim. To show an adverse employment action, an employee must demonstrate "a serious and material change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001). "[T]he employee's subjective view [of this] is not controlling." Id. Rather, the employment action at issue "must be materially adverse as viewed by a reasonable person" under the same circumstances. Id.; see also Doe v. Dekalb County School Dist., 145 F.3d 1441, 1453 (11th Cir. 1998) ("Any adversity must be material; it is not enough that a transfer imposes some de minimis inconvenience or alteration of responsibilities.") (addressing an ADA claim).

Sampath does not dispute that her salary, benefits, and hours remained unchanged. The change in her job responsibilities was minor. She would have supervised only three fewer employees under the new structure, which was only intended as temporary in the first place. Although she asserts that her title was changed, the record reflects no such change. Under these circumstances, we conclude that the change in Sampath's employment was not sufficiently serious to constitute an adverse employment action. Accordingly, her discrimination claim fails on this ground as well.

## III. CONCLUSION

Sampath appeals the grant of summary judgment in favor of Immucor as to her employment discrimination claims. First, because none of the evidence to which Sampath points would go to demonstrate that Ramsey was aware that Sampath's responsibility for the summary was less than he believed or that he was aware that Brost or Flier played more significant roles than he believed, we agree with the district court that Sampath has failed to show that Ramsey's reasons for dismissing her were pretextual. Second, because Sampath's salary, benefits, hours, and most of her job responsibilities were unchanged by the temporary reorganization of the IS department, we agree with the district court that Sampath's assignment during the reorganization did not rise to the level of an adverse employment action. Accordingly, we **AFFIRM** the district court's grant of summary judgment.