[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 13, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-12128
Non-Argument Calendar

_____

D. C. Docket No. 07-80065-CV-KLR

GERALD JACKSON,

Plaintiff-Appellant,

versus

THE GEO GROUP, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(February 13, 2009)**

Before BIRCH, BLACK and FAY, Circuit Judges.

PER CURIAM:

Gerald Jackson, an African-American male, appeals from the district court's

grant of summary judgment in favor of his employer, The GEO Group, Inc.

("GEO"), in his retaliation suit filed pursuant to 42 U.S.C. § 1981. The district

court concluded that Jackson failed to establish a prima facie case of retaliation

with respect to his termination and that, even if he had, he failed to show that

GEO's legitimate, non-retaliatory reason for terminating him was pretextual. After

reviewing the record and the parties' briefs, we AFFIRM.

## I. BACKGROUND

GEO specializes in the development and management of correctional

facilities worldwide, including South Bay Correctional Facility ("South Bay") in

Florida. R1-18, Exh. 10 at 1–2. Jackson began his employment with GEO as a

Corrections Officer in 1995, and soon thereafter was promoted to Sergeant, the

position he held when he began working at South Bay in 1997.[1] In 2003, he was

promoted to Lieutenant. R1-18, Exh. 1 at 3.

In September 2006, Jackson was in the position of Lieutenant overseeing

South Bay's Confinement Unit. Id. at 16. The Confinement Unit houses inmates

who are confined for twenty-three hours per day. R1-18, Exh. 9 at 19. Because

the inmates spend so much time in their cells, the Confinement Unit has to

---

[1] The hierarchy of South Bay's correctional staff, from lowest to highest, is: Corrections Officer, Sergeant, Lieutenant, Captain, Colonel/Chief of Security, Assistant Warden, Warden. R1-18, Exh. 11 at 1.

maintain a higher standard of sanitation than any other area of South Bay. Id. As Lieutenant, Jackson was responsible for, inter alia, ensuring that his sergeants carried out the necessary sanitation and upkeep of the unit. R1-18, Exh. 1 at 15.

In late August 2006, Jackson received a memorandum from GEO's Risk Manager discussing sanitation issues and needed repairs that had been discovered in an inspection of the unit. Id. at 17. Three weeks later, on 12 September 2006, Colonel Johnnie Wilds called Jackson into his office and informed him that he was being moved from the Confinement Unit and reassigned to a different group and time shift effective immediately. Id. at 13, 16. Wilds did not tell Jackson the reason for the change, only that he had "orders from [his] boss," which Jackson interpreted as referring to Assistant Warden Norvell Meadors. Id. As a result of the reassignment, Jackson's shift changed from 8:00 A.M. – 5:00 P.M., with Saturdays and Sundays off, to 3:00 P.M. – 11:00 P.M., with Wednesdays and Thursdays off. Id. at 7, 13. He was not disciplined, except to the extent that he considered the reassignment itself to be a form of discipline, nor was he demoted. Id. at 15. He also did not suffer a reduction in pay, hours, or benefits. Id. at 15–16. The reassignment occurred during the last month of his six-month rotation in the Confinement Unit and was the most recent of a number of shift changes Jackson had experienced during his time at South Bay. Id. at 4–7.

The following day, 13 September 2006, Jackson submitted an internal employee complaint regarding his reassignment. He asserted that Meadors had a history of racial bias and discrimination and had unfairly reassigned him. R1-18, Exh. 1 at Exh. 6. He requested to be returned to his position in the unit and to have Meadors's behavior regarding black employees investigated by GEO corporate staff.[2] Id. Warden Ernest Stepp replied to Jackson's complaint in a 26 September 2006 letter. Stepp stated that he, not Meadors or Wilds, had made the decision to reassign Jackson based on personal observations of conditions in the Confinement Unit and a high number of complaints from inmates.[3] Id. at Exh. 13. During his visit to the unit, Stepp found "lax security and specific security violations" and "a steady decline in overall unit sanitation." Id. These deficiencies, he believed, reflected "poor supervision on [Jackson's] part and substandard performance on the part of the other staff assigned." Id. Stepp also noted that the entire unit staff, not just Jackson, had been reassigned. Id. Given this evidence, he found Jackson's allegations of racial bias to be both meritless and "an attempt to defend and justify

---

[2] Jackson never explicitly asserted that the reassignment constituted discrimination, but rather that Meadors engaged in "unethical behavior" with respect to black employees at South Bay. Id.

[3] Jackson contends that Stepp could not have been aware about the decision at the time it occurred because if Stepp had known about it, he would have approached Jackson and informed him of the reassignment rather than letting Wilds do it. R1-18, Exh. 1 at 24.

4

[Jackson's] poor performance."[4] Id.

At some point in early October 2006, Jackson and one of his co-workers, Lee Goodin, spoke with a local newspaper regarding Meadors's alleged racial bias. R1-18, Exh. 1 at 26. The newspaper ran an article based on their interview on 11 October 2006. Id. at 27; R1-18, Exh. 2 at Exh. 8. The story included a response from Stepp, who deemed the charges "totally untrue" and stated that the reassignments were in response to problems with "performance and ability." R1-18, Exh. 2 at Exh. 8.

In late September 2006, South Bay began to monitor telephone calls between one of its inmates, Dwayne Johnson ("Mr. Johnson"), and his sister, Tracy Johnson ("Ms. Johnson"). R1-18, Exh. 6 at 8–9. In the course of listening to these calls, officials began to suspect that Jackson was involved in a relationship with one or both of them. R1-18, Exh. 3 at 9. Such a connection would constitute a violation of GEO policy and Florida law. See Fla. Admin. Code 33-208.002(26) (2008); R1-18, Exh. 11 at Exh. A. Based on these suspicions, Stepp asked the Florida Department of Corrections Inspector General's Office ("IGO") to investigate the matter. R1-18, Exh. 3 at 12. On 17 October 2006, Jackson and Goodwin were placed on unpaid administrative leave by Wilds in the presence of

---

[4] David Salser, a member of GEO's human resources department, also investigated Jackson's complaint and found it to have no merit. R1-18, Exh. 8 at 2, 17.

Valerie Harrell, South Bay's Human Resources Manager. Wilds told them that they were being suspended "pending an ongoing investigation," and he gave each of them a letter to that effect signed by Stepp. R1-18, Exh. 1 at 29. Though Jackson was not informed of the nature of this investigation, Stepp later testified that it had to do with his potentially improper relationship with Ms. Johnson.[5] R1-18, Exh. 3 at 8–9.

Inspector Richard Ryder of the IGO investigated Jackson's relationship with Ms. Johnson. As part of his investigation, he interviewed Jackson and listened to the tapes of the conversations involving Mr. Johnson. R1-18, Exh. 6 at 9, 20. From this research, Ryder learned that Jackson became friends with Ms. Johnson only after he started working at South Bay and that they had driven around together and engaged in business discussions. Id. at 10–11. Jackson confirmed these interactions and characterized the relationship as either financial or emotional. R1-18, Exh. 1 at 10–12. Based on this evidence, Ryder concluded that Jackson had violated Section 33-208.002(26) of the Florida Administrative Code by engaging in an improper relationship with Ms. Johnson. R1-18, Exh. 6 at 10. The Department of Corrections sustained this finding. Id. at 21.

GEO policy permits a hearing to be held when an investigation substantiates

---

[5] Goodin allegedly was being investigated on charges of having interfered with a different Human Resources investigation. R1-18, Exh. 4 at 9–10.

charges of wrongdoing. R1-18, Exh. 3 at 18. The hearing officer will render a recommendation, which is then reviewed by the warden and the regional office. R1-26, Exh. 1 at 3. In cases involving termination, the corporate office reviews the recommendation as well. Id. GEO held a hearing regarding Jackson's allegedly improper relationship in February 2007, which was conducted by James Brooks, then South Bay's business manager, in the presence of an assistant personnel manager. R1-18, Exh. 1 at 8; R1-26, Exh. 1 at 2. Based on the evidence presented at the hearing, Brooks found that Jackson had engaged in an inappropriate relationship with Ms. Johnson and recommended that Jackson be suspended for ten days. R1-18, Exh. 3 at 7. On 13 March 2007, Warden Stepp reviewed Brooks's findings and recommended that Jackson be terminated due to the seriousness of the offense.[6] Id. GEO's corporate office approved Stepp's recommendation and terminated Jackson's employment shortly thereafter. R1-18, Exh. 1 at 3; R1-18, Exh. 10 at 2.

Jackson filed suit in Florida state court, alleging that GEO discriminated and retaliated against him in violation of 42 U.S.C. § 1981 and Fla. Stat. § 448.101. GEO removed the action to the United States District Court for the Southern District of Florida. R1-1. Jackson claimed that GEO discriminated against him by

_____

[6] According to GEO, Stepp has terminated every employee who was engaged in such a relationship, including eleven total employees between 2004 and 2007. R1-18, Exh. 12 at 2.

reassigning him from the position of Lieutenant of the Containment Unit and retaliated against him by suspending and terminating him as a result of his speaking to the newspaper about alleged racial bias by Meadors. Id. at Exh. 1. After removal, GEO moved for summary judgment, which the district court granted. R2-40. The court found that Jackson failed to establish discrimination because he could show no evidence that he was reassigned because of his race or that similarly-situated black employees were treated more favorably. Id. at 15. His retaliation claims failed because he was not engaged in a statutorily protected activity and GEO had legitimate, non-retaliatory reasons for its actions. Id. at 16, 18. Jackson now appeals the grant of summary judgment on the retaliation claims.

## II. DISCUSSION

On appeal, Jackson argues that the district court erred in granting summary judgment regarding his retaliation claim pursuant to 42 U.S.C. § 1981. He asserts that his complaints qualified as statutorily protected activity, since he had a reasonable, good-faith belief that his reassignment constituted racial discrimination.[7] He also contends that the non-retaliatory reason cited by GEO for

---

[7] Jackson also states that his complaints were based not only on his reassignment but also on allegations of racial discrimination that he was making on behalf of other black supervisors. His brief offers no discussion of this point other than a single, conclusory statement, so the argument is waived. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

suspending and terminating him was actually a pretext for retaliation.

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. See Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 949 (11th Cir. 2000). "Summary judgment is appropriate when the pleadings, depositions and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgement as a matter of law." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1326 (11th Cir. 1998). To survive a motion for summary judgment, the nonmoving party must show more than just a "scintilla of evidence" to support its claim; rather it has to put forth sufficient evidence for a jury to reasonably find for it. Abel v. Dubberly, 210 F.3d 1334, 1337 (11th Cir. 2000) (per curiam).

We analyze a claim brought under § 1981 using the burden-shifting scheme established for Title VII claims, since both statutes have the same proof requirements. See Standard, 161 F.3d at 1330. In this case, the relevant portion of Title VII is 42 U.S.C. § 2000e-3(a), which deals with retaliation for statements made in opposition to unlawful employment actions.[8] Under the Title VII framework, the plaintiff has the initial burden of establishing a prima facie case of

_____

[8] This provision also discusses retaliation for participating in investigations or proceedings conducted under Title VII. 42 U.S.C. § 2000e-3(a). However, Jackson concedes that he would be eligible only under the "opposition clause" portion of the provision.

9

retaliation.  See Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002), modification on other grounds recognized by D'Angelo v. School Bd., 497 F.3d 1203, 1208–10 (11th Cir. 2007).  To meet this burden, he "must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two events." Id. (quotation marks, alterations, and citation omitted).  If he can establish this, the burden is then on the defendant to provide a legitimate, non-retaliatory reason for the adverse action.  See id.  If the defendant identifies such a rationale, the burden shifts to the plaintiff to show that this stated reason is pretextual.  See id.

For a plaintiff to engage in "statutorily protected expression" under the "opposition clause" of 42 U.S.C. § 2000e-3(a), he must have a "good faith, . . . reasonable belief" that the actions he is opposing would be unlawful under the statute at issue.  Weeks v. Harding Mfg. Corp., 291 F.3d 1307, 1312 (11th Cir. 2002) (quotation marks and citation omitted).  A "good faith, reasonable belief" has two components: the plaintiff must have subjectively believed that the employer was engaging in discriminatory practices, and that belief must be objectively reasonable in light of the record evidence and the controlling substantive law.  See Butler v. Alabama Dep't of Transp., 536 F.3d 1209, 1213 (11th Cir. 2008).  For discrimination claims under § 1981, the plaintiff must

10

establish that he experienced "an adverse employment action" in which he was treated differently from other employees because of his race. Id. at 1215. Not all employer actions that negatively impact an employee would qualify as "adverse employment actions." See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001). Only those employment actions that result in "a serious and material change in the terms, conditions, or privileges of employment" would be "adverse." Id. (emphasis in original). In determining whether this standard is met, we look at whether a reasonable person would view the action as materially adverse in light of the relevant facts. See id.

Our initial inquiry is whether Jackson has made out a prima facie case of retaliation based on his opposition. Both parties appear to agree that Jackson's suspension and termination would be adverse employment actions and GEO presents no argument on the causation prong. The only issue in dispute therefore would be whether Jackson showed that he was engaging in statutorily protected activity when he decided to speak with the newspaper reporter. For this to have been the case, at the time he spoke with the reporter, he must have held an objectively and subjectively reasonable belief that he had been subjected to an adverse employment action and, as part of the same action, had been treated differently because of his race, thereby violating § 1981. See Butler, 536 F.3d at

11

1215.

Based on our review of the record, there appears to be no basis for finding that Jackson was engaging in statutorily protected expression. Regardless of whether Jackson subjectively believed that he had been the victim of racial discrimination, no objectively reasonable person would deem this to have been the case. Most importantly, he was not opposing an employment action of the type necessary to establish discrimination. When Jackson was reassigned from his position on the Confinement Unit, he was not disciplined and did not experience a decrease in pay, benefits, rank, or hours. Though his shift schedule changed, such a switch had occurred repeatedly to him in the past. He also did not suffer any substantial loss in seniority due to the reassignment, since all of the supervisors regularly rotated through the position of increased autonomy in the Confinement Unit, and his reassignment occurred only a few weeks before he had been scheduled to rotate out of that position. A reasonable person would not deem these changes to constitute "a serious and material change in the terms, conditions, or privileges of employment," as would be necessary for the reassignment to be an adverse employment action and for Jackson's opposition to be statutorily protected expression. See Davis, 245 F.3d at 1239.

Furthermore, no objective observer would have viewed the reassignment as

12

racially discriminatory. By the time Jackson spoke with the reporter, Stepp already had responded to his internal complaint. This letter informed Jackson that Stepp, not Meadors, ordered the reassignment and that he had done so for entirely performance-related reasons. Jackson was therefore aware that his allegations of racial discrimination by Meadors had no merit. There thus would be no basis for a reasonable, good-faith belief that the reassignment resulted from discriminatory intent. Accordingly, we conclude that Jackson has not made out a prima facie case of retaliation under § 1981 since he has failed to show that his opposition constituted "statutorily protected expression."[9] Brochu, 304 F.3d at 1155. The district court thus did not err in granting summary judgment for GEO on Jackson's retaliation claim.[10]

### III. CONCLUSION

Jackson contends that the district court improperly granted summary judgment on his § 1981 claim that GEO retaliated against him by suspending and terminating his employment for speaking with a newspaper reporter about alleged

---

[9] We also note that GEO has provided a legitimate non-retaliatory rationale for suspending and terminating Jackson, namely his inappropriate relationship with Ms. Johnson, which was being investigated at the time that Jackson filed the complaints at issue here. Jackson has offered no convincing evidence to show that this reason was pretextual.

[10] In its brief, GEO requested the costs of responding to Jackson's appeal. Because GEO did not file a separate motion pursuant to Federal Rule of Civil Procedure 38 and our local Rule 38-1, we decline to consider the request at this time.

racial discrimination at South Bay.  We find that Jackson has failed to make out a

prima facie case of retaliation because his action did not constitute statutorily

protected activity and that GEO offered a legitimate, non-retaliatory reason for the

suspension and termination, which Jackson failed to show was pretextual.  We thus

AFFIRM the district court's grant of summary judgment.

**AFFIRMED.**